975 F.2d 1225
 UNITED STATES of America, Plaintiff-Appellee,
Cross-Appellant (91-1476/1478/1479/1488),
v.
Patrick SIMS (91-1363/1476); Duane Felder (91-1364/1478);
Jacques Gardner (91-1365/1488); Christopher
Russell (91-1366/1479),
Defendants-Appellants, Cross-Appellees,
Quintin Burt (91-1384), Defendant-Appellant.
 Nos. 91-1363 to 91-1366, 91-1384, 91-1476, 91-1478, 91-1479
and 91-1488.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 12, 1992.
Decided Sept. 25, 1992.
Rehearing and Rehearing En Banc
Denied Nov. 12, 1992.
 
 Kathleen Moro Nesi, Asst. U.S. Atty. (argued and briefed), Amy B. Hartmann, Office of the U.S. Atty., Detroit, Mich., for U.S.
 Timothy P. Murphy (briefed), Detroit, Mich., for Patrick Sims.
 Ted C. Farmer (briefed), Detroit, Mich., for Duane Felder.
 Joan E. Morgan (argued and briefed), Detroit, Mich., for Jacques Gardner.
 Arthur Jay Weiss (argued and briefed), Law Offices of Arthur Jay Weiss & Associates, Farmington Hills, Mich., for Christopher Russell.
 Ronald McDuffie (argued and briefed), Hatchett, Dewalt, Hatchett & Hall, Pontiac, Mich., for Quintin Burt.
 Before RYAN, BOGGS, and BATCHELDER, Circuit Judges.
 BATCHELDER, Circuit Judge.
 
 
 1
 This case involves cross-appeals of the government and five defendants. In the district court, all five defendants were convicted of conspiracy to possess cocaine with the intent to distribute and of various firearms violations, including separate violations of 18 U.S.C. § 924(c) for use of machine guns and use of non-machine guns. After the trial, the district court vacated the section 924(c) machine gun convictions of all defendants except Quintin Burt. After sentencing, each defendant appealed, and the government appealed as to all defendants but Burt.
 
 I. Factual Background
 
 2
 On May 31, 1990, at approximately 2:00 p.m., Derrick Brown, an undercover narcotics officer with the Wayne County Sheriff's Office, received a page on his portable pager. Brown responded by phoning the number that appeared on the pager. The person answering the telephone said his name was "Goodie" and that he was interested in purchasing 15 kilograms of cocaine.[1] Brown testified that Goodie had received the pager number from a confidential informant to whom Brown had given the number. Brown told Goodie that the price was to be $22,500 per kilogram, and that the total price would be $337,500. Goodie responded that this was no problem, that he had the money.
 
 
 3
 Goodie requested that the transaction occur at his residence, 3925 Fenkell Street, but Officer Brown would not agree to that location and suggested that Goodie call him back in a couple of hours. At about 3:45 p.m., Brown received another page to the same phone number as the earlier one. When Brown called the number, the person answering it identified himself as Goodie. As the two were discussing the amount of money involved, another man, identified as Goodie's brother, reiterated that they had the $337,500 to do the deal. Brown informed Goodie that he did not know him and therefore wanted the deal to occur in a public place. The man identified as Goodie's brother told Brown that he was hesitant to do it in a public place. Brown told him to talk it over with his "brother" and page him later if they were still interested.
 
 
 4
 At about 5:00 p.m. Brown received a page, phoned the number, and spoke to Goodie. The men agreed that the deal would take place at about 6:15 p.m. that day at the Burger King on Grand River and Livernois in Detroit. Brown said that he would be there in a black Chevy Blazer, and Goodie said that he and his partners would be in a black Pontiac 6000. At the end of the conversation, Brown asked Goodie if there were some way he could get in touch with him if he needed to. Brown then heard Goodie say, "Hey, Pat, what's your pager number?" after which Goodie recited the pager number. At about 6:20 p.m., Brown received a final page from Goodie, who said that he and his brother were going to be a little late.
 
 
 5
 During the late afternoon of the same day, officers of the Sheriff's Department were conducting surveillance in the area around 3925 Fenkell Street. Investigator George Brown was conducting "primary surveillance," and he began his observations at 3925 Fenkell at about 5:20 p.m. At that time, only a black Pontiac 6000 was parked outside. About 20 minutes later, a blue Merkur pulled behind the Pontiac, and a black male, later identified as Christopher Russell, got out of the car and entered 3925 Fenkell. At around 6:20, Investigator Brown observed four individuals leave the Fenkell Street residence. Russell and one other black male entered the Merkur, and two other individuals entered the Pontiac. Both cars proceeded to 2703 Clements Street, and all four men entered that residence. Brown noted the presence of a blue Oldsmobile Toronado backed into the driveway of 2703 Clements. Soon thereafter, Brown saw a black male, later identified as Jacques Gardner, leave the residence, open the trunk of the Toronado, remove a black bag that appeared to be heavy, and carry it into the residence. Gardner came out onto the upper porch of the residence a few moments later and looked both up and down Clements. Very soon thereafter, six black males left that location. One, later identified as Quintin Burt, carried two gun bags with him into the Toronado. A second individual, later identified as Antoine Burt, was also observed entering the Toronado.[2] Gardner carried the black bag and placed it into the back seat of the Pontiac, whereupon both he and Russell entered that vehicle. Two persons entered the Merkur; one, later identified as Patrick Sims, was carrying a large, pink plastic-type bag and entered the front passenger seat; the other, later identified as Duane Felder, entered the driver's side. Investigator Brown then followed the three cars as they proceeded to the area of the Burger King restaurant.
 
 
 6
 Officer Alexander Traczuk, along with Officer Robert Wood, who were conducting secondary surveillance, observed three cars in the vicinity of 3925 Fenkell, a black Pontiac 6000, a blue Oldsmobile Toronado, and a Merkur. These officers radioed in the Toronado's license plate and learned that it was registered to a person living at 2703 Clements Street. Eventually, the three cars left that area and travelled in a line toward the Burger King location. Other surveillance had indicated that gun cases had been loaded into the Toronado. Sergeant David DiBiasi, who was supervising the reverse sting operation, observed the Toronado driving around the Burger King location prior to the transaction, and he opined that it was conducting counter-surveillance.
 
 
 7
 Officer Derrick Brown was in a Chevy Blazer driven by Officer Harold Stockton. The two officers arrived at the Burger King location at about 7:00 p.m. As they arrived in the parking lot, the officers saw the black Pontiac, in which there were two black males (later identified as Gardner and Russell), pulling out of the lot. Next, they saw another black male (later identified as Sims) walking toward the Blazer. Brown stepped out of the Blazer and met Sims about 25 feet away from the Blazer. Brown asked Sims if he was "Goodie" to which Sims replied that he was. Brown then asked Sims if he had the money, to which Sims replied that it was in the Pontiac 6000.
 
 
 8
 As those events were occurring, the Pontiac pulled back into the lot, and stopped next to the drive-thru window. As the two men walked toward the Pontiac, Brown told Sims that he had brought only one kilo with him and that the other fourteen were just a phone call away. Brown walked up to the Pontiac and saw Gardner in the driver's seat and Russell in the back seat with a large black bag. The rear window was down, and Russell unzipped the bag, revealing large bundles of U.S. paper currency. After Brown saw the money, he gave the prearranged arrest signal, and then began walking with Sims to the Blazer. As they walked, Brown said to Sims, "Let's check out the dope." In the Blazer, Officer Stockton had one kilogram of cocaine that he and Brown had received from Sergeant David DiBiasi to carry out the sting operation. When Sims and Brown approached, Brown told Stockton to show Sims the dope. Stockton took out the kilo, removed a piece of tape from the package which covered a cut in the plastic, and handed it to Sims. Sims pressed his finger into it to test the cocaine. At that point, Stockton saw the black Pontiac leaving the parking lot and saw the police raid vehicles coming into the area, so he retrieved the package of cocaine. Stockton and Brown then grabbed Sims and placed him under arrest.
 
 
 9
 Simultaneously, the other officers were closing in on and arresting four other suspects. The Pontiac 6000, driven by Gardner and also containing Russell, drove a short distance before coming to an abrupt halt, at which time both men ran from the car. Both were apprehended within minutes and were arrested. In addition, several officers secured the Toronado before it could drive away. At that time, its occupants, Antoine and Quintin Burt, were arrested. The fifth defendant, Duane Felder, remained at large.
 
 
 10
 In this same general time frame, the officers participating in the sting operation conducted searches of the Pontiac, the Toronado, and finally the Merkur.[3] In the back seat of the Pontiac the officers found the large black bag containing the cash; when it was counted later there was a total of $336,700. They also found a Benelli 12-gauge, semi-automatic shotgun and a Smith & Wesson 9-millimeter pistol, both fully loaded. In the Merkur was found a pink plastic bag containing a Mossberg 12-gauge, pump-action shotgun with a pistol grip. There was also a Blockbuster Video card with the name Christopher Russell on it.
 
 
 11
 In the Toronado, there were two black nylon gun cases on the floor of the back seat. Each case contained an AR-15 semi-automatic rifle that had been converted to fire in an automatic mode. There were five loaded magazines for these weapons: two fully-loaded, 30-round magazines; one fully-loaded, 40-round magazine; and two drum magazines, each capable of holding 90 rounds, one containing 77 rounds and the other 80 rounds.
 
 
 12
 After being taken into custody, defendant Russell made statements to law enforcement officers. ATF Agent Roger Guthrie testified that Russell stated that he was at the Burger King location to provide security for the transaction, and that the cocaine was to be resold for $40,000 per kilogram.[4]
 
 
 13
 Soon after the arrests and the search of the vehicles and after Russell's statement, search warrants were obtained for both 3925 Fenkell and 2703 Clements. During the search of the Clements residence, numerous pieces of evidence were seized. These included utility bills in Patrick Sims's name, a holster for a handgun, a shipping box for a Benelli firearm, and four boxes of 9-millimeter ammunition. Also found were bills in Sims' name totaling about $2000 for repairs or improvements to the Oldsmobile Toronado that was titled to Lisa Z. Gregory. See supra note 3. In addition, the residence contained a manual on the conversion of AR-15s to fully automatic mode, a manual on AR-15 marksmanship, and internal parts that had been removed from an AR-15, which were consistent with the conversion of such a weapon to full-auto.
 
 
 14
 A search of the Fenkell address turned up numerous utility bills in the name of Duane Felder, and a check-cashing card with Duane Felder's name and photograph on it. Also found was a set of keys that fit the Merkur that the police had searched immediately after the arrests.
 
 
 15
 Defendant Duane Felder turned himself in to the police on June 1, 1990, the day after the others were arrested. At that time he made a detailed statement to law enforcement officers. He stated that he lived by himself at 3925 Fenkell Street. He admitted that on or about May 31, 1990, he received a pager number for someone who, he was told, could supply large quantities of cocaine. On that same day he contacted that individual and told him he needed 15 kilograms of cocaine. Felder said that he told the individual that he did not know how much 15 kilograms was worth, and that the individual told him it was about $350,000. He admitted that the meeting was set up for about 6:15 p.m. that evening at the Burger King at Grand River and Livernois. Felder stated that he drove in a blue Merkur from his Fenkell Street residence to an address on Clements Street. Once there, Felder went upstairs, took possession of a loaded shotgun, put the gun in a plastic bag, and walked out to the blue Merkur. Next, he drove to the Burger King area and parked. When he observed police coming into the area and exiting their vehicles, he got out of the Merkur and walked toward Livernois. Felder also stated that, although he had no money in on the deal, he and the others intended to pay full price for the cocaine, and the guns were only for protection of the money.
 
 
 16
 Finally, subsequent fingerprint analysis showed that one of the machine-gun drum magazines had Sims's fingerprint on it.
 
 
 17
 On June 14, 1990, a federal grand jury returned a nine-count indictment against the five defendants herein. A superseding indictment was subsequently filed and on October 4, 1990, a second superseding indictment was filed.[5] These indictments charged the defendants as follows:
 
 
 18
 Count 1--conspiracy to possess with intent to distribute cocaine; all five defendants
 
 
 19
 Count 2--use and carrying of machine guns during and in relation to a drug trafficking offense; all five defendants
 
 
 20
 Count 3--use and carrying of a firearm during and in relation to a drug trafficking offense; all five defendants
 
 
 21
 Count 4 (later consolidated into Count 3)--use and carrying of a firearm during and in relation to a drug trafficking offense; all five defendants
 
 
 22
 Count 5 (later consolidated into Count 3)--use and carrying of a firearm during and in relation to a drug trafficking offense; all five defendants
 
 
 23
 Count 6 (later Count 4)--possession of an unregistered machine gun; defendants Burt and Sims
 
 
 24
 Count 7 (later Count 5)--possession of a firearm by a convicted felon; defendant Sims
 
 
 25
 Count 8 (later Count 6)--possession of a firearm by a convicted felon; defendant Russell
 
 
 26
 Count 9 (later Count 7)--possession of a firearm by a convicted felon; defendant Burt
 
 
 27
 Prior to trial, defendant Felder moved for disclosure of the identity of the government's undercover informant. After holding an in camera hearing with the informant, the district court denied the motion. Defendants Gardner, Russell, and Burt moved to suppress the evidence found in the Pontiac, Toronado, and Merkur. The district court rejected this summarily, concluding that the automobile searches were permissible incident to arrest. Defendant Felder moved to suppress the evidence seized at the 3925 Fenkell residence. The district court also denied this motion, concluding that the affidavit in support of the search warrant was sufficient to show probable cause.
 
 
 28
 All five defendants went to trial, which was held in the middle of October, 1990. Each of the defendants moved for acquittal, and these motions were denied. Prior to instructing the jury, the court consolidated Counts 3-5 into a new Count 3. Thus, Counts 6-9 were renumbered as Counts 4-7. The jury returned guilty verdicts on all counts.
 
 
 29
 Post-trial motions were filed by all defendants. The district court granted the motions to vacate the convictions of defendants Sims, Felder, Gardner, and Russell on Count 2. The court denied defendant Burt's motion to vacate his conviction on Count 2, and instead vacated his conviction on Count 3. United States v. Sims, 767 F.Supp. 840 (E.D.Mich.1991).
 
 
 30
 At sentencing, the court set each of the defendants' base offense levels at 34, basing the offense level calculations on the 15 kilograms of cocaine that were involved in the attempted buy. Defendant Russell was given a two-point reduction for acceptance of responsibility. Defendants Gardner and Burt were each given three-point reductions for being minor participants. Sims, who had a criminal history category of I, was sentenced to 188 months imprisonment on Counts 1, 4, and 5 to be served concurrently, and 60 months consecutively on Count 3. Felder, who also had a criminal history category of I, was sentenced to 151 months on Count 1, and 60 months consecutively on Count 3. Russell, with a criminal history category of I, was sentenced to 121 months on Counts 1 and 6 to be served concurrently, and 60 months consecutively on Count 3. Gardner, also having a criminal history category of I, was sentenced to 108 months on Count 1, and 60 months consecutively on Count 3. Burt, who had a criminal history category of III, was sentenced to 135 months on Counts 1, 4, and 7 to be served concurrently, and 360 months consecutively on Count 2.
 
 
 31
 Timely appeals by all defendants were filed. In addition, the government filed a notice of appeal as to defendants Sims, Felder, Gardner, and Russell related to the disposition of Count 2.
 
 II. Machine Gun Convictions
 
 32
 The central issue in this case concerns the district court's handling of the defendants' convictions on separate section 924(c) counts for machine guns and non-machine guns. Therefore, we shall consider it first and will address later the other issues raised by the defendants-appellants.
 
 A. Background
 
 33
 At a post-trial, pre-sentencing hearing, the district court vacated the convictions on Count 2 (machine gun count) of defendants Sims, Russell, Felder, and Gardner.[6] The district court held that "where a defendant is charged with separate offenses under 18 U.S.C. § 924(c)(1) because of the use of different firearms, and only one predicate drug offense is charged, a conviction on both firearm counts cannot stand; one of them must be vacated." United States v. Sims, 767 F.Supp. 840, 842 (E.D.Mich.1991). In so ruling, the district court followed this Court's holding in United States v. Henry, 878 F.2d 937 (6th Cir.1989). The district court then continued as follows, "In Henry, the Sixth Circuit also held that the firearm offense most closely related to the drug offense is the one to stand, and the firearm offense which has a less clear and more tenuous relationship to the drug offense is the one to be vacated." 767 F.Supp. at 842.
 
 
 34
 Applying that standard to the facts before it, the district court concluded that the handguns and shotguns located in the Merkur and the Pontiac were more closely related to the transaction than the machine guns in the Oldsmobile. "Indeed, given the location of the Toronado, it is difficult to understand what role its occupants were expected to play as guards in the exchange." Id. at 842. After making those statements, the court added,
 
 
 35
 [V]acating the convictions of Felder, Gardner, Russell, and Sims on Count II avoids the necessity of determining whether the evidence was sufficient to sustain the convictions and whether the Pinkerton instruction was proper in light of the catastrophic consequences a conviction on this count would have on these men.
 
 
 36
 Id.
 
 
 37
 The government appeals this ruling and argues that the district court misunderstood Henry and failed to recognize Pinkerton's application to firearms violations. Defendant-appellant Burt also appeals on this issue, since his conviction on Count 2 was not vacated.
 
 
 38
 B. Relationship of Firearm to Predicate Offense
 
 1. Background
 
 39
 The Double Jeopardy Clause of the Fifth Amendment prohibits punishing a defendant twice for the same conduct. In this Circuit, it is well-settled that because of that prohibition a court may not impose more than one sentence upon a defendant for violations of section 924(c) which relate to but one predicate offense. United States v. Clark, 928 F.2d 733, 738 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991); United States v. Nabors, 901 F.2d 1351, 1357 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990); Henry, 878 F.2d at 942-45. Merging all section 924(c) convictions into one for purposes of sentencing avoids problems of multiplicity under the Double Jeopardy Clause. See Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (to determine whether there are two offenses or only one, question is whether each provision requires proof of an additional fact which the other does not); see also Clark, 928 F.2d at 738. Since the defendants-appellants were charged with and convicted of only one predicate offense, a judgment of conviction may be entered against each of them for only one violation of section 924(c), and each may receive only one sentence for violating section 924(c).
 
 2. Contentions of the Parties
 
 40
 a. Government
 
 
 41
 Citing both Henry and Nabors, the government acknowledges that the single predicate offense charged in Count 1 can support only one section 924(c) violation, or the convictions would be multiplicious. See Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 1673-74, 84 L.Ed.2d 740 (1985). The government contends that because the section 924(c) counts in this case involve weapons that carry different penalties under that statute, the specific approach taken by the court in Henry is not applicable to this case. The government asserts that the two section 924(c) convictions should be merged into one and the defendants should be given a single sentence. According to the government, if the jury convicts on each count, it is then for the court to determine at sentencing, by a preponderance of the evidence, whether the firearms were of a type that require enhancement under section 924(c). If the court so finds, then the greatest of section 924(c)'s 5-year, 10-year, or 30-year sentences should be imposed. If this approach is not taken and the defendant is not given the longest applicable sentence, the government contends, the court will impermissibly nullify the charging decision of the prosecution and the verdict of the jury, thereby usurping their functions, and will also undermine the legislature's substantive power to prescribe crimes and determine punishments. Finally, the government argues that interpreting and applying Henry as the district court has done would serve to shield defendants from their actions, since it would encourage them to keep non-machine guns closer to them whenever they were also using machine guns in relation to drug transactions.
 
 
 42
 b. Defendants-Appellants
 
 
 43
 The defendants-appellants Sims, Russell, Felder, and Gardner, and the defendant-appellant Burt make several contentions. They argue that the district court has discretion to determine which count to vacate, United States v. Clark, 928 F.2d 733 (6th Cir.) cert. denied, --- U.S. ----, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991), that its factual findings may be reversed only if clearly erroneous, United States v. Perry, 908 F.2d 56, 58 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990), that the rule of lenity requires that any uncertainty as to how the statute is to be construed must be resolved in favor of the more lenient sentence, e.g., Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), and that the government is simply arguing for a rule requiring imposition of the harshest possible penalty in all cases (Brief of Cross-appellee Sims, at 10).
 
 3. Discussion
 
 44
 Since Henry was central to the district court's analysis, we shall address it at the outset. In Henry, the defendant-appellant was convicted on one count each of manufacturing marijuana and possessing marijuana with the intent to distribute, and on two counts of using or carrying a firearm during and in relation to a drug trafficking offense. The facts were essentially as follows. The police received an anonymous tip that several persons were harvesting marijuana plants on Henry's property during the middle of the night. A short time after the police arrived, Henry was caught by the police while in a car, and Henry was found to be carrying a pistol. In addition, upon searching Henry's home, police located a large quantity of freshly cut marijuana, $2,100 in cash, another pistol in close proximity to the cash, and a rifle. Henry was charged with two separate section 924(c) violations: one for the handgun that he had been carrying when arrested (Count 3), and one for the weapons from the house (Count 4). See United States v. Henry, 878 F.2d 937, 943 (6th Cir.1989). Each gun count referred to both drug trafficking offenses. Henry was convicted on both section 924(c) counts and was sentenced to consecutive terms of five years for each count. Id. at 938-39.
 
 
 45
 On appeal, a panel of this Court vacated one of the section 924(c) convictions. We noted that since there were two predicate trafficking offenses, the defendant properly could have been charged with two section 924(c) offenses, and that the controlling factor was not, as the government there contended, the number of weapons, but the number of predicate offenses. Id. at 942. And, we noted specifically that if the indictment had related the weapons in one section 924(c) count to one of the trafficking counts, and the weapons in the other section 924(c) count to the other trafficking offense, both of the gun counts could have been affirmed. Id. at 945. However, since the indictment did not link the particular weapons to the particular trafficking conduct, we concluded that the relationship of the weapons to the predicate offenses must be examined. We then found that the appropriate method of examining this relationship was through the use of the "fortress analogy theory" developed by the courts for cases involving firearms found on premises under the control of drug offense offenders.
 
 
 46
 We concluded that under the fortress theory the rifle and the pistol that were found in Henry's house had been used to protect his drugs or otherwise facilitate his drug transactions, and therefore had been used "during and in relation to" a drug trafficking crime. 878 F.2d at 944. We also concluded that the gun which Henry was carrying when he was arrested was part of the fortress arsenal, and therefore bore "the same relationship to the drug trafficking crimes as did the weapons in the house." Id. at 944. After identifying certain issues that were not before us in the case, we continued:
 
 
 47
 However, even as to carried weapons, "the requirement that the firearm's use or possession be 'in relation to' the crime would preclude its application in a situation where its presence played no part in the crime, such as a gun carried in a pocket and never displayed or referred to in the course of a pugilistic barroom fight." S.Rep. No. 225, 98th Cong., 2d Sess. 314 n. 10 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10.
 
 
 48
 Even though the firearm charged in count three had a more direct relationship to the defendant, its relationship to a drug trafficking crime was less clear.
 
 
 49
 878 F.2d at 945 (emphasis supplied). Thus, we vacated Count 3, because we concluded that of the two gun convictions, the one arising out of the weapons that were found in Henry's house bore a closer relationship to a drug trafficking offense than did the one for the gun Henry was carrying when he was arrested. Id. at 945.
 
 
 50
 As we have noted, in the present case the district court interpreted this emphasized passage from Henry as requiring a trial court to determine which of the weapons for possession of which a defendant is convicted bears the closer relationship to the predicate offense: "In Henry, the Sixth Circuit also held that the firearm offense most closely related to the drug offense is the one to stand, and the firearm offense which has a less clear and more tenuous relationship to the drug offense is the one to be vacated." United States v. Sims, 767 F.Supp. 840, 842 (E.D.Mich.1991). Although Henry has been cited and discussed in several subsequent cases,[7] no panel has addressed the relationship of different categories of weapons under section 924(c) to the predicate offense.
 
 
 51
 We believe that Henry must be distinguished from the present case because, unlike this case, Henry involved weapons which all carried the same penalty under section 924(c). We conclude that the difference between the applicable sentences for handguns and machine guns mandates a different approach when both kinds of weapons are involved in a single drug trafficking offense.[8]
 
 
 52
 Section 924(c)(1) provides, in pertinent part,
 
 
 53
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years.
 
 
 54
 Thus, section 924(c) distinguishes among the different categories of firearms by mandating different penalties for their use. The three distinct categories of weapons are distinguished by the penalties associated therewith: (1) machine guns, destructive devices, or guns with silencers or mufflers--30 years; (2) short-barreled rifles and short-barreled shotguns--10 years; and (3) all other firearms--5 years.
 
 
 55
 In situations such as this one, where the indictment contains only one substantive drug trafficking offense and separate counts under section 924(c) for weapons which fall into more than one weapons category as defined by that section, the court must consolidate those section 924(c) counts, either pre- or post-trial so that no defendant will be convicted on more than one gun count relative to the one drug trafficking offense. This may be accomplished prior to trial by consolidating those counts into a single section 924(c) count and submitting special interrogatories or a special verdict form to the jury, requiring that if the jury returns a guilty verdict on the gun charge, it must specify which category or categories of weapons it unanimously has found the defendant was using or carrying. Or, it may be accomplished by submitting the separate gun counts to the jury and, should there be more than one conviction, merging those convictions after the trial.[9] In either event, only one sentence would be imposed for the section 924(c) offense, regardless of the number of separate section 924(c) counts contained in the indictment relative to the single substantive drug trafficking offense.
 
 
 56
 Regardless of when consolidation or merger takes place, the sentence imposed by the district court for the violation of section 924(c) should reflect the highest of the sentences which Congress has provided. We believe that by establishing different sentences for different types of weapons, Congress expressed its intention to punish more severely the use and carrying of what it considers to be more dangerous weapons. This system of penalties for first-time violators of section 924(c) is three-tiered: 5 years for use or carrying of any weapon not otherwise specified; a heavier penalty of 10 years for short-barreled rifles or shotguns, perhaps because Congress considered that the power and concealability of these weapons rendered them more dangerous than most other weapons; and 30 years for machine guns and explosive devices, presumably because Congress considered them to be even more dangerous than the others. We hold that defendants who have been convicted of section 924(c) violations involving weapons carrying different penalties must be sentenced to the highest applicable sentence in this hierarchy. To do otherwise would be to nullify Congress's clear intent to impose more severe penalties for carrying more dangerous weapons.
 
 
 57
 We find support for our interpretation of section 924(c) in a very recent decision of the Tenth Circuit. United States v. Moore, 958 F.2d 310, 314 (10th Cir.1992). The pertinent facts in Moore are very similar to those of the present case, although the version of section 924(c) applicable to the defendant-appellant Moore carried only a ten-year penalty for use or carrying of a machine gun. The court held,
 
 
 58
 Although we conclude that Moore may only be convicted and sentenced for one violation of § 924(c), we do not agree with Moore's contention that we should direct dismissal of Count 4 and vacation of the heavier sentence on that machine gun count.... We feel that the statute here clearly requires the heavier penalty because of the machine gun's use, and that it would be contrary to the intent of Congress to dismiss the more serious charge and penalty. Moore's argument that there was greater evidentiary support for Count 2, dealing with the other firearms, than for Count 4, is unpersuasive because we have determined that there was sufficient evidence to support the verdicts of guilty on both counts.... Thus, in accord with the evident intent of Congress to punish defendants using machine guns in connection with crimes of violence or drug trafficking offenses more severely than those using only handguns, we feel that the conviction to be entered should be under Count 4, along with the mandatory minimum ten-year sentence therefor.
 
 
 59
 Id. at 314; see also United States v. Casey, 776 F.Supp. 272, 275 n. 3 (E.D.Va.1991) (dicta).
 
 
 60
 Nothing in the legislative history of the statute conflicts with our analysis. In 1986, Congress amended section 924(c) and for the first time established different mandatory sentences depending on the type of weapon. Firearm Owners' Protection Act, Pub.L. No. 99-308 § 104, 100 Stat. 449, 456 (1986). With respect to this new differentiation, the House Report merely states,
 
 
 61
 Subsection (a) [of section 104 of the Firearm Owners' Protection Act] adds a new mandatory prison term of ten years for using or carrying a machine gun during and in relation to a crime of violence or a drug trafficking offense for a first offense, and twenty years for a subsequent offense to the mandatory penalty provision of 18 U.S.C. 924(c).
 
 
 62
 H.R.Rep. No. 495, 99th Cong., 2d Sess. 28 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1354. Subsequently, Congress further amended section 924(c) to its current form to provide different penalties for short-barreled rifles and short-barreled shotguns, and to increase the penalty for machine guns to 30 years. See Crime Control Act of 1990, Pub.L. No. 101-647 § 1101, 104 Stat. 4789, 4829; Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690 § 6460, 102 Stat. 4181, 4373-74.
 
 
 63
 C. Pinkerton Liability for Section 924(c) Offenses
 
 
 64
 In his Memorandum of April 24, 1991, the district judge stated that because he was vacating Count 2 (the machine gun count) for defendants-appellants Sims, Russell, Felder, and Gardner, he "avoid[ed] the necessity of determining whether evidence was sufficient to sustain the convictions and whether the Pinkerton instruction was proper in light of the catastrophic consequences a conviction on this count would have on these men." 767 F.Supp. at 842; J.A. at 184. In its initial brief on appeal, the government raises the question of Pinkerton liability for the types of offenses at issue here, in an apparent attempt to persuade the Court to hold that these defendants were properly convicted.
 
 
 65
 Despite the government's contentions, we conclude that the question of the sufficiency of the evidence on Count 2 and issues relating to the Pinkerton instruction given by the district court are not properly before us. They certainly were not decided by the district court, since by vacating four of the defendants' convictions on the machine gun count, the district court indicated that it had obviated the necessity of determining whether the evidence in the case was sufficient to sustain the convictions on that Count and whether a Pinkerton instruction on that Count was appropriate. In fact, the only place in the Joint Appendix where reference is made to the sufficiency and Pinkerton issues as to Count 2 is in the portion of the district court's Memorandum of April 24, 1991, which is quoted above. And no part of the record that is before us indicates whether these issues had been raised properly in post-trial motions.
 
 
 66
 Ordinarily, of course, we would have no occasion even to mention issues such as this one which are not are not clearly before us. However, under the circumstances of this case, the district court's reference to Pinkerton and sufficiency issues as to Count 2 places this Court in a difficult situation. If such issues were not raised in post-trial motions prior to this appeal, it certainly would not be appropriate to permit the defendants to raise them for the first time on remand. But, if they were raised properly in post-trial motions, as is implied by the district court's Memorandum, since they have yet not been ruled upon by the district court it would not be appropriate for this Court to issue a final disposition of the cases as if these issues did not exist. And, if they were raised properly in the trial court, the defendants can hardly be found to have waived their right to have those issues decided since the district court's vacating of the convictions on the machine gun counts, while obviating the need to address those issues, also obviated the defendants' need to appeal the verdict relative to those counts. If we were to remand for consolidation of Counts 2 and 3, but did not leave open the possibility of consideration of outstanding issues related to Count 2, we would likely eliminate the defendants' only chance to have such issues considered by the district court.[10] This dilemma arises because of the state of the record, as presently constituted, and because of the manner in which the district court issued its ruling.
 
 D. Conclusion
 
 67
 For all these reasons, we conclude that the district court's decision vacating the machine gun convictions of Sims, Gardner, Felder, and Russell must be REVERSED, and these cases must be REMANDED. On remand, the district court shall determine whether there are any outstanding issues of sufficiency of the evidence or Pinkerton liability related to the machine gun count (Count 2), and, if there are such outstanding matters, rule on them.[11] If these issues were not properly raised in the district court or if they were properly raised but the district court rules against the defendants on them, the district court shall merge the convictions on Counts 2 and 3. In addition, the district court shall then resentence the defendants in a manner consistent with this Opinion and the outcome of its subsequent deliberations.
 
 
 68
 The district court had no occasion to address the Pinkerton matters as to defendant Burt, because his machine gun conviction did not rest on a Pinkerton theory. Therefore, for the reasons set forth above, we AFFIRM the district court's sentence of Burt on Count 2, and REMAND his case only to have the district court merge Counts 2 and 3.[12]
 
 III. Other Issues
 
 69
 Having resolved what we perceive to be the central issue in this case, we will proceed to discuss the other matters raised by the defendants-appellants.
 
 A. Search of the Fenkell Street Residence
 
 70
 In the district court, Felder filed a motion to suppress all evidence seized from his residence at 3925 Fenkell Street. The district court denied the motion. We affirm the district court's ruling.
 
 
 71
 It is not altogether clear under what standard we are to review magistrates' probable cause determinations. Compare United States v. Davidson, 936 F.2d 856, 859 (6th Cir.1991) (deferential standard), with Williams v. United States, --- U.S. ----, 111 S.Ct. 1572, 114 L.Ed.2d 74 (1991) (Supreme Court hinted that the de novo standard is the appropriate one), and United States v. Williams, 949 F.2d 220, 221-22 & n. 1 (6th Cir.1991) (applying the de novo standard after the Supreme Court remand), cert. denied, --- U.S. ----, 112 S.Ct. 2308, 119 L.Ed.2d 229 (1992). In the present case, however, it is unnecessary for us to resolve this question since even under a de novo standard it is clear that the magistrate's probable cause determination was correct.
 
 
 72
 Probable cause is a flexible standard, to be determined on the facts of each case. It is to be determined from the perspective of a reasonable law enforcement officer, and all that is required is "a 'practical, nontechnical' probability that incriminating evidence is involved." United States v. Barrett, 890 F.2d 855, 861 (6th Cir.1989) (quoting Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983)). Even without according deference to the magistrate's decision in this case, it is clear that there was probable cause to believe that the apartment at 3925 Fenkell Street in Detroit, Michigan, contained evidence of a crime. That apartment was the residence of one of the participants identified as being part of the drug transaction, and was the place where Felder suggested the transaction take place. In addition, as the district court noted, Felder was at large and could have tried to conceal other evidence that remained in the house. Also, as Officer Stockman's affidavit indicated, big-time drug traffickers, like the defendants here, often use more than one residence as a base of operations. Under all of these circumstances, there was probable cause for the magistrate to issue a search warrant for the Fenkell Street residence.
 
 B. Identity of the Undercover Informant
 
 73
 In the district court, defendant Felder also moved for disclosure of the identity of the confidential informant who had set up his contact with Officer Derrick Brown. The district court conducted an in camera hearing with the informant in order to determine whether disclosure would be appropriate. The court denied the request, noting that the informant had merely served to introduce the defendant to Brown and had not participated in the drug transaction or the negotiations leading up to it.
 
 
 74
 We agree with the district court's determination. There is nothing in the record which indicates that the informant did anything more than introduce Felder to Officer Brown. The district court did not abuse its discretion in denying discovery of the informant's identity. United States v. Straughter, 950 F.2d 1223, 1232 (6th Cir.1991), cert. denied, 112 S.Ct. 1505 (1992).
 
 C. Sufficiency of the Evidence
 
 75
 When a defendant challenges the sufficiency of the evidence underlying his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.
 
 1. Gardner
 
 76
 We reject Gardner's challenge to the sufficiency of the evidence on the conspiracy count. The evidence at trial showed that Gardner met with the other defendants at the Clements Street residence in the hours prior to the planned drug deal. Gardner was seen by a surveillance officer taking a black bag, which appeared to be very heavy (and was later found to have the money in it), out of the Oldsmobile and carrying it into the Clements residence. Shortly thereafter, Gardner appeared on the porch of 2703 Clements, looked either way down the street, then returned inside. A few moments later, Gardner carried the bag out of the residence and placed it into the Pontiac 6000. In addition, Gardner was the driver of the Pontiac 6000, which held both the bag of cash and two weapons. It is beyond question that the evidence showing the existence of a conspiracy was very solid. The government's proof that Gardner was connected to the conspiracy "need only be slight," so long as it is sufficient to establish the connection beyond a reasonable doubt. United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). Since "[a] defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances," id. at 211, it is clear that the evidence regarding Gardner was sufficient to connect him to the conspiracy.
 
 2. Felder
 
 77
 Defendant Felder first contends that there was insufficient evidence to convict him on any of the counts. Felder argues that it was impermissible for him to be convicted solely on the basis of his confession, without other evidence in support thereof. He cites Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), for the proposition that the government must introduce more than just a defendant's extra-judicial statement to convict him. Both parties cite and discuss this Court's decision in United States v. Marshall, 863 F.2d 1285 (6th Cir.1988), as supporting their position on this issue.
 
 
 78
 In Marshall, we cited a long line of Supreme Court and circuit court cases in support of the proposition that an accused's admissions of essential facts or elements of a crime must be corroborated by other evidence, 863 F.2d at 1286-87, and we also made an important observation about this legal doctrine.
 
 
 79
 Courts have held that proof that the criminal act took place--the so-called "corpus delicti"--will satisfy the corroboration requirement. In cases where there is no clear proof of the corpus delicti, courts have required independent evidence corroborating defendant's statements.
 
 
 80
 Id. at 1287 (citations omitted). This rule controls the present case. Since there is overwhelming evidence that several crimes occurred, the corpus delicti requirement has been met. Therefore, there is no need for independent corroboration. Even if corroboration were required, there is sufficient evidence of it. Investigator Brown identified Felder as the individual who drove the Merkur to the Burger King, and the search of Felder's apartment yielded the keys to the Merkur. This evidence was sufficient to support a conviction on the conspiracy charge.
 
 
 81
 Felder next argues that there was insufficient evidence to convict him on Count 3 (the section 924(c) count for all of the non-machine guns). This Court has held that although the government must "establish[ ] some relationship between the firearm the defendant possessed and the predicate drug trafficking offense," United States v. Brown, 915 F.2d 219, 224 (6th Cir.1990), this burden is not difficult, especially in drug cases. United States v. Christian, 942 F.2d 363, 368 (6th Cir.1991) (noting the "well-recognized nexus between drugs and firearms"), cert. denied, --- U.S. ----, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992). The government
 
 
 82
 is not required to show that the defendant displayed or brandished the firearm. Even if a firearm remains hidden throughout a crime, its concealed presence may have been in relation to the crime if it facilitated the crime by emboldening the defendant, giving him the security and confidence to undertake the criminal act.
 
 
 83
 Brown, 915 F.2d at 224. This Court has stated that the term "uses" in the statute "should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions." Christian, 942 F.2d at 368. This last statement is particularly apt here, since Felder admitted that he carried a shotgun to the Merkur and that he was present at the transaction to protect the money, which was integral to the drug deal. The evidence was sufficient to convict Felder on the firearms charge of Count 3.
 
 D. Section 922(g) Convictions
 1. Section 922(g) Jury Instruction
 
 84
 Defendant Russell contends that because two guns were named in the indictment on the section 922(g) charge against him (Count 6 of the Redacted Indictment), and no procedure was used for the jury to specify which gun, if either, they unanimously agreed Russell possessed in violation of the statute, his right to a unanimous jury verdict was denied. Russell asserts that although a unanimity charge was given on the section 924(c) counts, none was given on the section 922(g) counts.
 
 
 85
 The government concedes that no unanimity charge was given on that count, but contends first that Russell made no objection and the standard of review is therefore "plain error," and second that since the court had given a unanimity charge to the jury on the section 924(c) counts, "it was reasonable for the jury to understand that this requirement also applied to the 922(g) gun charge." (Response Brief of United States, at 19).
 
 
 86
 In federal court the jury must return a unanimous verdict of guilty in order for the defendant to be convicted. Fed.R.Crim.P. 31(a); see, e.g., United States v. Gordon, 844 F.2d 1397, 1400-01 (9th Cir.1988). When a defendant fails to object to the lack of a unanimity instruction, the court reviews the instructions for plain error. United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982); United States v. Sanderson, 966 F.2d 184, 187 (6th Cir.1992). Russell contends he did make a challenge to the lack of a unanimity instruction, citing pages 23-24 of the transcript on October 23, 1990. Although these pages were not made part of the Joint Appendix, we have examined them and conclude that no such challenge was raised. Thus, the appropriate standard of review is consideration for plain error.
 
 
 87
 We affirm the district court on this issue. Even if Russell had raised an objection, no reversal would be required. In analyzing the need for a specific unanimity instruction, this Court has held, "The touchstone has been the presence of a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." United States v. Duncan, 850 F.2d 1104, 1114 (6th Cir.1988); accord United States v. Holley, 942 F.2d 916, 926 (5th Cir.1991); see Sanderson, 966 F.2d at 187. In the present case, the two guns charged in Redacted Count 6 were in the same car, in the back seat of the Pontiac in which Russell was seated during the defendants' attempted purchase of cocaine. Thus, there is no chance of jury confusion or of differing outcomes with regard to these two guns. Therefore, even under a stricter standard of review, Russell cannot prevail on this issue.
 
 2. Section 922(g): Restoration of Rights
 
 88
 Defendant Russell argues the jury may have convicted him of the section 922(g) violation with respect to a weapon which he could lawfully possess under Michigan law. He contends that his rights were restored as to non-pistols, and therefore, he could possess a shotgun. Since two of the weapons involved in the drug deal were shotguns, Russell asserts that it is impossible to tell which of the weapons was the basis of the jury's verdict.
 
 
 89
 This Court very recently rejected the precise argument raised by Russell. United States v. Driscoll, 970 F.2d 1472 (6th Cir.1992). Driscoll controls the outcome here, and therefore, Russell's argument regarding restoration of rights is rejected.
 
 E. Sentencing Issues
 
 90
 1. Concurrent Sentences of Sims and Russell on § 922(g)
 
 
 91
 Defendant Russell was sentenced to 121 months on the section 922(g) charge, to be served concurrently with the drug offense. Defendant Sims was sentenced to 188 months on the section 922(g) charge, to be served concurrently with the drug offense. Both Russell and Sims contend, and the government concedes, that these sentences exceed the statutory maximum sentence. Title 18, section 924(a)(2) provides, "Whoever knowingly violates subsection (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." Therefore, the district court erred in sentencing Russell and Sims to terms of imprisonment of greater that 120 months on the section 922(g) charge. Under these circumstances, we will vacate the excessive sentences and remand for resentencing. United States v. Iddeen, 854 F.2d 52, 56 (5th Cir.1988); see United States v. Young, 916 F.2d 147, 152 (4th Cir.1990).
 
 2. Russell's Role in the Conspiracy
 
 92
 Defendant Russell contends that he should have been given a two-level reduction for having only a minor role in the offense. Sentencing Guideline section 3B1.2(b) provides that if the defendant is a minor participant, he should receive a two-level reduction in the offense level. "Minor participant" under the Guideline means "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 3 (1991).[13]
 
 
 93
 Although the sentencing judge had given reductions of 3 levels each to defendants Burt and Gardner for their minor roles in the offense,[14] he rejected Russell's request to the same effect, stating,
 
 
 94
 I find that Mr. Russell, while he was not as culpable as Mr. Sims or Mr. Felder, was the Bag Man, so-called. He had control of the $330,000 in the back seat of the Pontiac, zipped open the bag so that the Undercover Agent could see that the money was there, and is not entitled to any reduction because of his role in the offense.
 
 
 95
 Any consideration given to Mr. Russell would be given in relationship to whether or not he should be sentenced at the high end or low end of the range.
 
 
 96
 (J.A. at 728-29).
 
 
 97
 Russell contends that the presentence report labelled Burt, Gardner and him as "equally culpable." He also identifies other conduct by Burt and Gardner that he believes demonstrates that they were more culpable than he. (Brief of Appellant Russell, at 14-17). Although counsel has thus made an estimable effort on the issue, there is no reversible error here.
 
 
 98
 The district court's determination as to role in an offense is a finding that is "heavily dependent on the facts," and the defendant has the burden of proving such mitigating factors by a preponderance of the evidence. United States v. Perry, 908 F.2d 56, 58 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990). The sentencing court's determination on this issue may be reversed only if clearly erroneous. Id. at 58.
 
 
 99
 It is the district judge, not the probation officer responsible for the presentence report, who presided at the trial and understands the interstices of the case. Thus, his determination that Russell had a greater role in the conspiracy than Burt or Gardner, and that therefore he was not a minor participant, will not be overturned.
 
 3. Calculation of Base Offense Levels
 
 100
 a. Introduction
 
 
 101
 The district court determined that based on the quantity of cocaine involved in the transaction, all of the defendants would start with a base offense level of 34. Both Russell and Gardner contend that the district court erred in calculating their base offense levels. Both argue that there was insufficient evidence to demonstrate that they knew the quantity of drugs that was to be involved in the transaction. They assert that the court should have erred on the side of caution and held the quantity for each of them to be 1 kilogram, rather than 15.
 
 
 102
 Sentencing Guideline section 2D1.4 outlines the approach for determining the base offense level in drug conspiracies: "If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." Guideline section 2D1.1(c) establishes a base offense level of 34 for transactions involving at least 15 kilograms of cocaine, and a base offense level of 26 for transactions involving at least 500 grams but less than 2 kilograms of cocaine.
 
 
 103
 At sentencing, the prosecution bears the burden of proving by a preponderance of the evidence the quantity of drugs involved. United States v. Gonzales, 929 F.2d 213, 216 (6th Cir.1991). The district court's determination of the quantity of drugs for which a defendant will be held accountable is a factual finding that must be accepted on appeal unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990).
 
 
 104
 This Court's recent decision in Walton recognized the difficulty of determining the quantity of drugs when the trafficking offense is conspiracy and no cocaine is actually seized. 908 F.2d at 1301. In that case, we looked to the Application Notes to Guideline section 2D1.4 for guidance. Those Notes have changed substantially since the sentencing that was at issue in Walton. In the version relevant to the present case, those Notes, in pertinent part, provide as follows.
 
 
 105
 If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount.
 
 
 106
 Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance.
 
 
 107
 U.S.S.G. § 2D1.4, Application Notes 1 & 2 (1991; effective November 1, 1989). In the cases involving conspiracy, Note 1 also directs attention to Application Note 1 to § 1B1.3.[15] Guideline section 1B1.3 is concerned with relevant conduct and it provides that the base offense level shall be determined on the basis of "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable" that occurred in preparation for the offense or during its commission. U.S.S.G. § 1B1.3(a)(1) (1991; effective November 1, 1989); see Guidelines Manual Appendix C, at 30-31 (1991). Application Note 1 to that section provides in pertinent part,
 
 
 108
 In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence the relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.
 
 
 109
 Despite these changes in the Application Notes, our more general statements in Walton still guide the sentencing court in making quantity determinations.
 
 
 110
 We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate. Thus when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.... Adopting this standard allows a District Court to perform its traditional fact-finding mission, yet still protects defendants from being held responsible for drug quantities in excess of the amounts for which they more likely than not are responsible. Allowing a court to find a defendant responsible for the maximum quantity of drugs that can plausibly be found could result in defendants receiving excessive sentences based on a finding of quantity that is more likely than not excessive. Such a result would violate a defendant's due process rights. While this may result in an underestimation of the quantity of drugs involved in some few cases, we believe it is nonetheless constitutionally required to prevent excessive sentences.
 
 
 111
 908 F.2d at 1302 (citations omitted; second emphasis supplied). These standards will be applied to each defendant separately.
 
 
 112
 b. Russell
 
 
 113
 After hearing an extensive argument on the issue, the district court concluded that the government had proved by a preponderance of the evidence that the extent of Russell's involvement showed that he should be sentenced based on 15 kilograms. The court noted that Russell knew he was sitting with a bag full of money in the back seat of the Pontiac, "[a]nd it's a fair inference that he knew the amount of the money he was displaying and ... that [he] was aware that $337,000 would buy 15 kilograms of cocaine." The judge noted that Russell had travelled to both the Fenkell Street house and the Clements Street house with defendants Sims and Felder.
 
 
 114
 Russell cites United States v. Gonzales, 929 F.2d 213 (6th Cir.1991), and United States v. Jacobo, 934 F.2d 411 (2d Cir.1991), to support his contention that the government must prove that he intentionally and knowingly dealt in the pertinent quantity of drugs. Those cases do not so hold, and it is clear from the Guideline Application Note that the government bears no such burden.
 
 
 115
 Russell's main argument in the district court, which he renews in this Court, is that he made a statement to police about his involvement in these offenses, but that he never mentioned the amount of drugs to be involved in the purchase. Under the current Guideline Application, of course, Russell's knowledge is irrelevant. The issue is whether it was foreseeable to Russell that the transaction would involve 15 kilograms of cocaine.
 
 
 116
 The district court's factual findings, as they relate to Russell, are not clearly erroneous. Russell was the bagman; he both carried and saw the money. There is also evidence that he admitted that the cocaine was going to be resold for $40,000 per kilogram. From this the district court's inference that he knew how much cocaine was to be involved is a reasonable one. Even if imputing such knowledge would be inappropriate, as noted above, the standard is foreseeability and with the quantity of cash Russell carried and showed to Officer Brown it was certainly foreseeable that such a quantity of cocaine was involved.
 
 
 117
 c. Gardner
 
 
 118
 At sentencing, the district court determined Gardner's base offense level to be 34 based on the fifteen kilograms of cocaine. After listening to argument from counsel for the government and the defendant, the court stated, "I need not repeat the scoring for Mr. Gardner. I think the record clearly reflects the Guideline range and the manner in which the Court reached it."
 
 
 119
 On appeal, Gardner concedes that Guideline section 1B1.3 permits the court to base the quantity of drugs on the amounts with which other co-conspirators were involved, but asserts that such amounts must be reasonably foreseeable to the defendant. Gardner's argument on this issue is essentially that any implicit finding by the sentencing court that fifteen kilograms of cocaine was foreseeable to him is unsupported and must be overturned.
 
 
 120
 The government responds that Gardner had carried the bag into the Clements Street address and back out to the Pontiac, that the bag appeared to be heavy, and that Gardner was seen in the back seat. From this evidence, the government draws the inference that Gardner knew of the great amount of money in the bag. From this initial inference the government then draws the further inference that since he knew the "great amount of money" in the bag, the amount of drugs in the transaction was foreseeable to him.
 
 
 121
 Without determining who has the better of this argument, we conclude from our review of the record that the record does not "clearly reflect the Guideline range and the manner in which the [district] court reached it." Thus, Gardner's sentence must be vacated and remanded for the district court to resentence Gardner and state his reasons for selecting the offense level. Although Gardner suggests a more appropriate base offense level would be 26 for the one kilogram of cocaine that the police had in their possession to set up the deal, this is a matter better left to the district court on remand.
 
 IV. Summary and Conclusion
 
 122
 The conviction of Burt is hereby AFFIRMED, and his case is REMANDED only to permit the district court to merge his convictions on Counts 2 and 3.
 
 
 123
 The convictions of Sims, Gardner, Russell, and Felder are AFFIRMED, their sentences are VACATED, and the district court's vacating of the convictions of Sims, Gardner, Russell, and Felder on Count 2 is REVERSED. Their cases are REMANDED with instructions to the district court to determine whether there are any outstanding issues of sufficiency of the evidence or Pinkerton liability related to the machine gun count (Count 2), and, if there are such outstanding matters, rule on them. If these issues were not properly raised in the district court or if they were properly raised but the district court rules against the defendants on them, the district court shall merge the convictions on Counts 2 and 3. In addition, on remand the district court must resentence these four defendants in a manner consistent with this opinion.
 
 
 
 [1]
 Two separate men identified themselves as Goodie. Patrick Sims did so at the time of the cocaine transaction, but the testimony indicates that Duane Felder was the individual on the phone
 
 
 [2]
 Antoine Burt is a juvenile and was not a defendant in this matter in the district court
 
 
 [3]
 Investigation into the ownership of the vehicles revealed that the Pontiac 6000 was owned by Patrick Sims, the Merkur was owned by Christopher Russell, and the Tornado was titled to Lisa Z. Gregory, whose address was the same as that of Sims
 
 
 [4]
 At trial was the first time Agent Guthrie mentioned that Russell said something about reselling the cocaine for that amount. On cross-examination, Guthrie admitted that between June 4, 1991, and August 30, 1991, on at least ten occasions he either prepared written statements or testified under oath about Russell's confession but never once mentioned the fact that Russell stated they were going to resell the cocaine for $40,000 per kilogram
 
 
 [5]
 After the trial, on October 25, 1990, the final indictment, a redacted version of the original, was filed
 
 
 [6]
 The district court delivered its ruling orally, then issued a written opinion which was eventually published at 767 F.Supp. 840
 
 
 [7]
 See, e.g., United States v. Chambers, 944 F.2d 1253 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992); United States v. Clark, 928 F.2d 733 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991); United States v. Brown, 915 F.2d 219 (6th Cir.1990); United States v. Nabors, 901 F.2d 1351 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 192, 112 L.Ed.2d 154 (1991); United States v. Bronaugh, 895 F.2d 247 (6th Cir.1990); United States v. McGhee, 882 F.2d 1095 (6th Cir.1989)
 
 
 [8]
 We note that this conclusion is not inconsistent with Henry, where we observed, "Thus, contrary to defendant's contentions, the two section 924(c) counts should not have been merged. However, this is because two separate predicate offenses were charged, not, as the government suggests, because more than one gun was involved." 878 F.2d at 942
 
 
 [9]
 This Court has implicitly approved of merging multiple 924(c) counts for sentencing purposes. United States v. Clark, 928 F.2d 733, 738 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991); see Henry, 878 F.2d at 942; United States v. Sellars, 951 F.2d 351 (6th Cir.1991) (Table; text in Westlaw), cert. denied, --- U.S. ----, 112 S.Ct. 3008, 120 L.Ed.2d 882 (1992); see also Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 1673-74, 84 L.Ed.2d 740 (1985)
 
 
 [10]
 Of course, to the extent that the district court was concerned about the propriety of a Pinkerton instruction for section 924(c) violations, our ruling in United States v. Christian, 942 F.2d 363, 368 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992), decided after entry of judgment in this case, holds that as a matter of law a Pinkerton instruction is appropriate in a 924(c) case
 
 
 [11]
 We note that there is no relationship between the potential punishment an offense carries and the legal questions of sufficiency of the evidence or propriety of certain jury instructions
 
 
 [12]
 We note that the district court did not mention the sufficiency of the evidence as to Count 2 for defendant Burt, and Burt has not raised it in his appeal. Therefore, we have no occasion to address that issue
 
 
 [13]
 "Minimal participants" are defined as defendants "who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, Application Note 1 (1991)
 
 
 [14]
 Guideline section 3B1.2 permits a 3-level reduction if the participant's role falls between minimal and minor
 
 
 [15]
 This is the significant change from the version of the Application Note discussed in Walton. Effective November 1, 1989, the Commission deleted the portion of Application Note 1 to section 2D1.4 which had provided, "If the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or reasonably foreseeable," (emphasis supplied), and instead referred sentencing courts to Application Note 1 of section 1B1.3