RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0319P (6th Cir.)
File Name: 04a0319p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

*v.*

No. 02-6122

JAMES K. HOPPER,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 01-00191—R. Allan Edgar, Chief District Judge.

Argued: August 10, 2004

Decided and Filed: September 21, 2004

Before: KEITH, MARTIN, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles P. Dupree, Chattanooga, Tennessee, for Appellant. Steven S. Neff, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Charles P. Dupree, Chattanooga, Tennessee, for Appellant. Paul W. Laymon, Jr., ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. James K. Hopper appeals his jury conviction of conspiracy to possess red phosphorous knowing and intending that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 846 and 843, and of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 846 and 841. Hopper also appeals the district court's denial of his motion for a new trial based upon newly-discovered evidence. For the reasons that follow, we AFFIRM the judgment of the district court.

I.

On January 8, 2002, Hopper was named in a four-count superseding indictment charging him with various controlled substance offenses. The jury found Hopper not guilty of the offense of knowingly and intentionally manufacturing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and of knowingly and intentionally possessing the materials necessary to manufacture methamphetamine with the intent that it would be used to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6). However, the jury found him guilty of conspiring to possess red phosphorous knowing and intending that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 843(a)(6) and 846, and of conspiring to manufacture 500 grams or more of a substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. The following evidence adduced at trial demonstrated Hopper's involvement in his conspiracy convictions.

In early 1999, Charles "Bobo" Brooks, after learning the amount of money that could be made from the selling of red phosphorous–an ingredient necessary to manufacture

methamphetamine–began purchasing it from a company named Pyrotek. Before his arrest, Brooks had purchased approximately sixty pounds of red phosphorous for forty-five dollars per pound and had sold it for up to sixteen hundred dollars per pound. The police arrested Brooks in August 1999, and he was ultimately convicted of conspiracy to manufacture methamphetamine.

Upon Brooks's arrest, the police interviewed Hopper at his residence in November 1999 to discuss his connection with Brooks and his involvement with the sale or distribution of red phosphorous. Detective Tommy Farmer testified that at this initial interview Hopper admitted that he bought red phosphorous from Brooks and that he sold it at a profit to people who were involved in the manufacturing of methamphetamine. Brooks's testimony at Hopper's trial corroborated this statement, as he testified that he sold in total "a few pounds, 10 maybe" of red phosphorous to Hopper, charging him approximately $1000 per pound "so he could make a profit." Hopper was not arrested or charged with any crime after this initial interview.

Before learning how to manufacture methamphetamine, William Easterly sold the controlled substance to Hopper. After learning how to manufacture methamphetamine, Easterly bought red phosphorous from Hopper, later learning that Hopper had acquired the red phosphorous from Brooks. After Brooks's arrest, Hopper and Easterly drove to the Atlanta home of Jackie Gissendanner, who sold red phosphorous and who apparently wanted to learn how to manufacture methamphetamine. On one visit, Easterly manufactured methamphetamine on Gissendanner's premises with the assistance of Gissendanner and Hopper. Easterly also "cooked" methamphetamine in Hopper's garage and testified that while Hopper was not "the cook," he did aid in

the manufacturing process.[1] Easterly testified that he again traveled to Gissendanner's home to cook more methamphetamine and saw Hopper there with his son. Easterly testified that Hopper remained in a different room with his son, while the other men manufactured methamphetamine. Following a traffic stop, Easterly was arrested in April 2000 when the police discovered thirty-six grams of methamphetamine on his person. Easterly pleaded guilty and was sentenced to five years imprisonment.

Before his arrest, however, Easterly had introduced Hopper to James Marter and Mitchell Bivens. Marter and Bivens subsequently purchased red phosphorous from Hopper. Hopper introduced Marter to Gissendanner, and Marter began purchasing red phosphorous from Gissendanner. Marter testified that he observed Gissendanner and Hopper manufacturing methamphetamine in Hopper's garage and that he would help Gissendanner, Gissendanner's son, and Hopper with their "cooks." Marter testified that on one occasion he had Gissendanner and Gissendanner's son complete the manufacturing process for him and that he then shared with them the methamphetamine that resulted. Marter also testified that he observed Easterly manufacturing methamphetamine in Hopper's garage. Both Marter and Bivens were arrested and pleaded guilty to controlled substance offenses.

On June 13, 2001, Detective Farmer again visited Hopper's residence to assist a case agent from the Department of

---

[1] While Easterly testified that he did so with Hopper's permission and assistance, Hopper testified that he did not give Easterly permission to cook methamphetamine in his garage. Hopper, however, also testified that because "there [is] a possibility to everything," there was a possibility that Easterly was indeed manufacturing methamphetamine in his garage. Inconsistently, Hopper's later testimony states that when he discovered that Easterly was manufacturing methamphetamine on his property he "r[an] him off." Hopper maintained, however, that he was not present during the manufacturing process.

Children Services, who had received an anonymous call reporting "allegations of domestic violence, lack of supervision, and possible drug activity," as well as medical neglect. During this second visit to Hopper's residence, Detective Farmer noticed an odor that he knew to be associated with the manufacturing of methamphetamine. Detective Farmer noticed in plain view in the garbage a bottle of fuel line antifreeze and some coffee filters, both of which are used in the manufacturing of methamphetamine. At that point, Detective Farmer requested, and received, permission to search the premises.[2] Detective Farmer noticed in the detached garage a large bottle of hydrogen peroxide and some muriatic acid–both used to manufacture methamphetamine. Behind the garage, Detective Farmer noticed a "burn pile," which he knew from experience was a common way that people destroyed the evidence of methamphetamine production. Finally, Detective Farmer noticed that beside the barn area there was a worn path leading into the woods. This path led to an area where Detective Farmer located two garbage bags, which essentially contained the remains of a methamphetamine lab. Hopper was indicted in October 2001, and arrested in December 2001. A second-superseding indictment was issued in January 2002, and Hopper was convicted of two of the offenses contained in the superseding indictment in February 2002. Thereafter, Hopper filed a motion for a new trial based upon newly discovered evidence, which the district court denied. This timely appeal followed.

## II.

Hopper argues that insufficient evidence supports his conviction for conspiracy to manufacture methamphetamine in violation of U.S.C. §§ 846 and 841. We review a claim of

---

[2] Although Hopper testified that he did not give permission to Detective Farmer to search the premises, the district judge, after an evidentiary hearing, denied Hopper's motion to suppress evidence, finding Detective Farmer's account of the events fully credible.

insufficient evidence in the light "most favorable to the United States and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Couch*, 367 F.3d 557, 560 (6th Cir. 2004) (internal quotation marks omitted).

Notably, Hopper mischaracterizes the nature of the evidence against him relating to the charge of conspiracy to manufacture methamphetamine. Hopper argues that "[h]e did not participate in large cooks or donate his chemicals for a portion of the yield, and no one has said he did anything based on the success of a future production or sale." Hopper also notes that Marter "never claimed that Hopper ever cooked with him." Our review of Marter's trial testimony indicates that although Hopper did not actually manufacture the methamphetamine himself because he did not know how "to cook," it does indicate that he readily helped in other ways, such as "get[ting] acetone, clean[ing] jars," and "filter[ing] dope off." Moreover, similar evidence indicating that Hopper actively assisted in the manufacturing process is reflected in Easterly's testimony. Easterly testified that Hopper "helped [him] if [he] needed some help" by "get[ting] Coleman fuel or coffee filters or making the aluminum balls to go in the muriatic acid." Under these facts, we hold that any rational trier of fact could conclude that the United States has met its burden of proving that Hopper conspired to manufacture methamphetamine. *See id.*[3]

---

[3] Hopper also argues that because there was insufficient evidence to support the distinguishing element between his conviction of conspiracy to manufacture methamphetamine and his conviction for conspiracy to possess red phosphorous–i.e., the agreement to manufacture methamphetamine–the charge of conspiracy to possess red phosphorous knowing and intending that it would be used to manufacture methamphetamine becomes a lesser-included offense of conspiracy to manufacture methamphetamine. Given our holding that sufficient evidence supports Hopper's conviction for conspiracy to manufacture methamphetamine, we find it unnecessary to address this argument because it is dependent upon the success of his claim of insufficient evidence.

### III.

We now turn to Hopper's argument that the jury instructions were erroneous. Hopper argues that the instructions were erroneous in that they allowed the jury to conclude that evidence sufficient to convict him of conspiracy to possess red phosphorous was sufficient in and of itself to convict him of conspiracy to manufacture methamphetamine. Additionally, Hopper argues, citing no precedential support, that the district court erred by not instructing the jury that it had to agree unanimously as to the identity of his co-conspirators. We find these arguments unpersuasive.

First, we note that Hopper made no objections to the jury instructions, nor did he specifically request a unanimity instruction. Thus, we are limited to plain-error review. *United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004). Also, in addressing this argument, we assume that the jury followed the instructions as given. *United States v. Tosh*, 330 F.3d 836, 842 (6th Cir. 2003) ("A jury's verdict represents a finding that a crime was committed as alleged in the indictment . . . . [T]he court must assume that the jurors were diligent in following the precise instructions given to them." (internal quotation marks and citations omitted)).

Second, we reject Hopper's argument that the jury instructions were erroneous in that they allowed the jury to conclude that evidence sufficient to convict him of conspiracy to possess red phosphorous was sufficient, in and of itself, to convict him of conspiracy to manufacture methamphetamine. The district court clearly instructed the jury on the nature of the two different offenses and the facts that the jury had to find to convict Hopper of each, independent conspiracy charge. The district court instructed the jury on each count contained in the indictment and separately discussed each element that the United States had to prove beyond a reasonable doubt. The instructions as given simply did not allow the jury to conclude that evidence sufficient to convict Hopper of conspiracy to possess red phosphorous was in and

of itself sufficient to convict him of conspiracy to manufacture methamphetamine.

Third, Hopper argues that the district court erred in not making a unanimity instruction. Hopper "neither requested nor received an enhanced unanimity instruction." *Tosh*, 330 F.3d at 842. Most generously construed, Hopper argues that the specific identity of his co-conspirators is an element of the crime of conspiracy to manufacture methamphetamine and, as such, must be unanimously found by the jury. We addressed a similar argument in *United States v. Humphrey*, 287 F.3d 422 (6th Cir. 2002), *overruled on other grounds*, *United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002). In *Humphrey*, we noted: "the specific unanimity instruction sought by Humphrey is generally required only in one of three circumstances: when the nature of the evidence is particularly complex; when there is a variance between the indictment and the proof adduced at trial; or when there is some tangible evidence of jury confusion, as when the jury has asked questions of the court." *Id.*

As in *Humphrey*, none of these circumstances exists in this case. *Id.* at 440. Hopper points to no evidence indicating that the jury was confused, and if anything, its finding of not guilty on two of the four counts contained in the indictment indicates that it understood its duties under the instructions. Moreover, as we found in *Humphrey*, the district court "provided a thorough instruction on what constitutes a conspiracy." *Id.* at 439. Under these circumstances, we find Hopper's argument that the jury instructions were erroneous without merit.

### IV.

Finally, we turn to Hopper's argument that the district court erred in denying his motion for a new trial. On May 30, 2002, Hopper filed a motion for a new trial based on newly-discovered evidence pursuant to Federal Rule of Criminal Procedure 33. The motion argued that he discovered

evidence after trial indicating that the trial testimony of Marter and Easterly may have been untruthful. The motion was supported by the unsworn statements of four prisoners, each indicating that Marter had stated in conversations with them that he and Easterly were testifying in order to reduce their sentences and that Marter was willing to lie if necessary to receive a reduction. On June 18, 2002, the district court denied the motion finding that the evidence was only impeachment evidence and that even if the testimony of Marter were disbelieved, it "would not likely have produced an acquittal."

A motion for a new trial based on newly-discovered evidence should be granted when the defendant has demonstrated that "(1) the new evidence was discovered after trial; (2) the evidence could not have been discovered earlier with diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986). We review a district court's decision to grant or deny a motion for a new trial based upon newly discovered evidence for an abuse of discretion. *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

The district court did not abuse its discretion in refusing to grant Hopper's motion for a new trial based upon newly discovered evidence. Hopper has not demonstrated that the "new" evidence was discovered only after trial and that it could not have been discovered earlier with diligence. Indeed, Hopper called one of these inmates, James Wooten, whose statement was attached to his motion for a new trial, to testify at his trial. Wooten testified to matters that form the basis of Hopper's newly-discovered evidence claim—Marter told him that he was going to testify against Hopper to receive a sentence reduction and indicated his willingness to lie in the process. Even though the other inmates whose statements were attached to Hopper's motion for a new trial did not testify at trial, Wooten's testimony indicates that this evidence was discoverable to Hopper through due diligence.

Moreover, any use of these statements, given Wooten's testimony at trial, would be cumulative and merely impeachment evidence. *See O'Dell*, 805 F.2d at 640. Under these circumstances, the district court did not abuse its discretion in denying Hopper's motion for a new trial.

For the foregoing reasons, we AFFIRM the judgment of the district court.