**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0775n.06
Filed: September 2, 2005

**No. 04-1495**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

                                       **ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN**

ARTHUR BOWLSON,

     Defendant-Appellant.

                                           /

**BEFORE:** **KEITH, BATCHELDER, COLE, Circuit Judges.**

**KEITH, Circuit Judge.** The Defendant-Appellant, Arthur Bowlson, was indicted by a federal grand jury on five counts of bank robbery, each in violation of 18 U.S.C. § 2113(a), and two counts of using, carrying, and brandishing a firearm during a crime of violence, each in violation of 18 U.S.C. § 942(c)(1)(A)(ii). On February 11, 2003, a jury convicted Bowlson of all seven counts of the indictment. More than a year later, on February 24, 2004, the district court sentenced Bowlson to concurrent sentences of 121 months on counts one through five, a consecutive term of seven years on count six, and a consecutive term of twenty-five years on count seven. On appeal, Bowlson challenges his multiple convictions and his sentencing by the district court. For the reasons set forth below, we AFFIRM Bowlson's convictions, VACATE his sentence, and REMAND this case for re-sentencing by the district court.

**I. BACKGROUND**

During the period between May 1 through September 18, 2001, Bowlson committed five

bank robberies. The first bank robbery occurred on May 1, 2001, at the Old Kent Bank on Harper Avenue in Clinton Township, Michigan. Bank employees could not identify Bowlson because he was wearing a ski mask over his face; he also had placed tape over the tips of his fingers apparently to avoid leaving his fingerprints at the scene. The employees, however, observed the masked individual leap over the teller counter, grab a teller by the arm, and point a gun at the teller, all prior to escaping with $6,411. Bowlson's wife later admitted that she had driven Bowlson to the Old Kent Bank that day, waited in the car while he went inside, and that he returned to the car with a gun and a fisherman's hat stuffed with cash.

On June 1, 2001, Bowlson robbed another branch of the Old Kent Bank. The bank's surveillance camera recorded parts of this robbery, showing that the robber wore a ski mask over his head and had placed tape over his fingertips. Bowlson leaped over the teller counter and escaped with $7,434.

On July 25, 2001, Bowlson demanded $2,631 from tellers at the Huntington National Bank in Mt. Clemens, Michigan. Again, he wore a ski mask over his head and tape on his fingers as he leaped over the teller counter and took money from the tellers' drawers. On this occasion, one of the tellers successfully gave Bowlson a packet of "bait bills" containing a dye pack. At about the time Bowlson was leaving the bank, a passerby observed a "smoke bomb" explode inside a blue Ford Taurus and then observed a bag being thrown out of the car window. Where the bag landed, the authorities discovered red-dyed currency. The authorities also recovered a baseball hat and a ski mask. On the day in question, Bowlson had borrowed his wife's blue Taurus, and she found a red stain on the floor of the vehicle consistent with the chemicals in the dye pack.

2

Approximately two weeks later, on August 6, 2001, Bowlson robbed the Huntington National Bank on Harper Avenue in Clinton Township. Bowlson entered the bank wearing a mask and carrying a child's pink backpack, leaped over the teller counter, and took $11,481 from the tellers' drawers while pointing a gun in the faces of the two tellers. Police later identified Bowlson's palm prints on the counter he jumped over.

Following his fourth robbery, Bowlson recruited some of his friends to commit bank robberies with him. He told Robert Moore that he had "hit" banks before, sometimes with a note and sometimes with a gun, and that he got more money when he used a gun. The fifth robbery took place on September 18, 2001, at the National City Bank on Harper Avenue in St. Clair Shores, Michigan. Moore drove the vehicle transporting Bowlson, while Amont Jefferson and Marco Houston were supposed to "run interference" in a second car to facilitate Moore and Bowlson's escape. On the morning of September 18, Houston borrowed Jefferson's girlfriend's white Mercury Sable and then picked up Bowlson at a hotel where he and his wife had spent the night. Moore borrowed his girlfriend's green Ford Focus, but the men later exchanged cars prior to arriving at the bank. Jefferson and Houston followed Bowlson to the bank in the Focus. Bowlson first sent Jefferson inside to see whether there was bulletproof glass and to observe the number of people who were inside. Jefferson and Houston then parked the green Ford Focus across the street while Bowlson went inside, and Moore drove around to the alley to wait for him.

As in the previous heists, Bowlson leaped over the teller counter, wearing a black ski mask and holding a duffle bag in one hand and a gun in the other. He collected $12,594, including a packet of bills from which the serial numbers had been recorded. As Bowlson exited the bank, a

3

private citizen, Donald Hurst, observed him get into a white car that was sitting in an alley with the engine running. When another bank customer told Hurst that Bowlson had just robbed the bank, Hurst jumped into his truck and called the police while he followed the suspected bank robbers. Police joined the chase and followed the white Sable down a major street into the next city, Grosse Pointe Woods, where the car eventually crashed into a traffic island. Bowlson and Moore dropped a bag outside the car and ran into a nearby school where they were finally apprehended. The authorities recovered stolen currency from the car, a handgun in the discarded bag, and a black mask and other clothing in another bag. Although Bowlson was initially charged only for the fifth bank robbery, he was later turned over to federal authorities to whom he confessed that he had committed all five bank robberies.

## II.  CHALLENGES TO BOWLSON'S BANK ROBBERY CONVICTIONS

We address each of Bowlson's arguments against his convictions.

### A.  Sufficiency of the Evidence

Bowlson contends that the government did not submit sufficient evidence to sustain a conviction against him because, he says, the government failed to: show that the Old Kent banks were insured by the Federal Deposit Insurance Corporation (FDIC), present any eyewitness that could positively identify him as the robber, or produce the actual gun used in the bank robberies. The government counters that it presented a bank witness who testified with regard to the bank's FDIC insured status, and that the other evidence presented amply proved not only Bowlson's identity as the robber but also that he used a gun in the commission of these offenses.

Bowlson did not move, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for

4

a judgment of acquittal prior to the jury deliberations. In such a case, this court reviews the record only for plain error resulting in a manifest miscarriage of justice. *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989); *United States v. Cox*, 957 F.2d 264, 265 (6th Cir. 1992). In reviewing a claim against the sufficiency of the evidence, we must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Swidan*, 888 F.2d at 1080.

Here, Bowlson argues that the government did not show that the Old Kent banks were FDIC insured. Bowlson's claim, however, contradicts the record. The record reveals that the government called as a witness the assistant vice president of Fifth Third Bank who testified that the deposits of its predecessor, the Old Kent Bank, were insured by the FDIC.

Similarly, Bowlson's claim that the government did not produce an eyewitness who could positively identify him must be rejected. The government called Bowlson's wife, who testified that she drove him to the first bank and that he returned to the car with a gun and money. Robert Moore, who participated in the fifth bank robbery with Bowlson, identified Bowlson in the courtroom. Bowlson used a distinctive mode of operation in all of the robberies; he wore a ski mask, taped his fingertips, and leaped over the teller counter. In light of all of the evidence at trial, the jury reasonably concluded that Bowlson was the robber without an eyewitness.

Bowlson's argument that the government did not introduce the actual firearm during the trial can also be rejected. In addition to the above evidence, two bank tellers and a bank customer all testified that the robber used a gun. The gun was visible as well in the banks' surveillance cameras.

5

Thus, the evidence was sufficient to support Bowlson's convictions.

## B. Newly Discovered Evidence

Bowlson next claims that, after the trial, he learned for the first time that the officers had interviewed Brent Crowell. Robert Moore testified at trial that he, Bowlson, and Houston all went to Crowell's home to obtain a gun. According to Moore, Crowell was unwilling to provide a gun, so they stole it from him by deception. Crowell's proposed testimony was that he never owned a gun. On appeal, Bowlson contends that Crowell's contradiction of Moore could have revealed him (Moore) as a liar to the jury, which in turn could have discarded the remainder of his testimony.

"A motion for a new trial based on newly-discovered evidence should be granted when the defendant has demonstrated that (1) the new evidence was discovered after trial; (2) the evidence could not have been discovered earlier with diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. Hopper*, 384 F.3d 252, 258 (6th Cir. 2004) (citation omitted). We review a district court's denial of such a motion for an abuse of discretion. *Id*.

Applying these principles, Bowlson's challenge must be rejected. Bowlson knew of Crowell's existence prior to trial and has failed to show that he could not have discovered Crowell's planned testimony earlier. Moreover, Crowell's testimony only concerned the origins of the firearm used in the commission of the crime. As set forth above, the testimony of other witnesses and other evidence sufficiently supports the fact that a firearm was used. Bowlson now seeks Crowell's testimony in an attempt merely to impeach Moore's account of what occurred. He has not explained how Crowell's testimony amounts to more than merely impeaching evidence. In light of the

substantial evidence introduced against Bowlson at trial, we do not conclude that any testimony by Crowell would likely have resulted in Bowlson's acquittal.

### C. Suppression of Confession

Bowlson was initially charged by state authorities only with the fifth bank robbery. Counsel was appointed to represent him on that charge. When the federal government decided to prosecute, the state charge was dismissed and Bowlson was subsequently arrested and interviewed by the Federal Bureau of Investigation (FBI). During the FBI interview, Bowlson confessed to all five robberies and admitted using a gun. He now contends that his confession to the FBI must be suppressed because any questioning of him after the appointment of his counsel on the state charge violated the Sixth Amendment.

"The Sixth Amendment right . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced. . . . And just as the right is offense specific, so also its . . . effect of invalidating subsequent waivers in police-initiated interviews is offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). In this case, the government agreed that it would not introduce into evidence Bowlson's confession to the fifth robbery. Since the state charged Bowlson and appointed him counsel only for the fifth robbery, his Sixth Amendment right to counsel only applied to that offense. Accordingly, the district court properly denied Bowlson's motion to suppress the portion of his confession regarding the other robberies that was offered by the government.

### D. Racial Composition of the Jury

Bowlson claims that he objected in the district court to the fact that, despite the racial

makeup of the surrounding area, his jury venire was composed of only one African American. He further complains that the only African American who was chosen for the jury was later dismissed as one of the alternates. According to Bowlson, these facts "constitute a prima facie example of a violation of the cross section [requirement]." Appellant's Br. at 20.

"Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *United States v. Hill*, 146 F.3d 337, 343 (6th Cir. 1998) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)).

> A prima facie case of a fair cross section violation requires the defendant to show:
> 1) that the group alleged to be excluded is a "distinctive" group in the community;
> 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 343 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Thus, to establish a constitutional violation, Bowlson has to show that the jury selection process systematically excluded African Americans. He has not done so. He has not even alleged as much. Accordingly, he has no viable claim.

**E. Jury Instruction on Unanimous Verdict on § 924(c) Offenses**

Here, Bowlson argues that his convictions under 18 U.S.C. § 924(c) must be vacated because the jury was not instructed that they needed to unanimously determine whether he possessed, used, and carried the firearm. Bowlson, however, did not object to this jury instruction in the district court. "When a defendant fails to object to the lack of a unanimity instruction, the court reviews the

instructions for plain error." *United States v. Sims*, 975 F.2d 1225, 1240 (6th Cir. 1992) (citations omitted); *see also United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004). "In analyzing the need for a specific unanimity instruction, this Court has held, 'The touchstone has been the presence of a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts.'" *Sims*, 975 F.2d at 1240-1241 (quoting *United States v. Duncan*, 850 F.2d 1104, 1114 (6th Cir. 1988)).

In the present case, Bowlson was convicted of two counts of using, carrying, and brandishing a firearm during the commission of a crime. The government contends that a unanimity instruction was unnecessary because the evidence demonstrated that Bowlson committed all three acts punishable under the statute; that is, he used, carried, and brandished the firearm. We agree. This case does not present a genuine risk that the jury was confused or that different jurors convicted Bowlson of committing different acts. The witness testimony and other evidence presented at trial supported the government's claim that Bowlson used, carried, and brandished a firearm during the bank robberies. As such, there was no danger that the jurors failed to agree on the criminal behavior involved here, and the district court's failure to give the unanimity instruction for which Bowlson now advocates did not constitute plain error.

## E. Whether Bowlson Was Denied a Fair Trial Because Jurors Viewed Him in Shackles

Finally, Bowlson argues that different members of the jury observed him in shackles on two occasions. The government concedes that at least one juror may have been able to observe Bowlson while he was in shackles and being transported to or from the courtroom. But Bowlson identified to the court a second juror whom he believed had observed him at a separate time. The district court

questioned each of these jurors. The district court also offered to give a curative instruction to the full jury and to excuse the jurors who Bowlson thought had viewed him in shackles. Bowlson declined the offer to excuse the jurors, and indicated he wanted the court to give a cautionary instruction at the end of the case. Bowlson did not request any other relief in the district court.

This court addressed a claim similar to Bowlson's in *United States v. Moreno*, 933 F.2d 362 (6th Cir. 1991), where the court undertook the following analysis:

> We will not disturb the district court's denial of defendants' motion for mistrial absent a showing of abuse of discretion. Exposure of the jury to a defendant in shackles requires a mistrial only when the exposure is so 'inherently prejudicial' as to deny the defendant's constitutional right to a fair trial. We have distinguished the inherent prejudice to a defendant who is shackled while in the courtroom from a defendant who has been observed in shackles for a brief period elsewhere in the courthouse. Defendants are required to show actual prejudice where the conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial. Courts have expressed a preference for remedial action after an accidental observation of a defendant in custody.
>
> In the instant case, defendants were inadvertently observed in shackles while being transported by the marshals and the jury learned of defendants' custodial status through trial testimony. The record fails, however, to support defendants' claims of inherent prejudice warranting mistrial. Their claims are further undermined by the district court's instruction to the jury that the custodial status of the defendants was not indicative of guilt or innocence and, therefore, should be disregarded. There is the presumption that juries will follow such curative instructions. Because defendants failed to show prejudice, we find defendants' contention that the district court abused its discretion in denying their motions for mistrial meritless.

*Id.* at 368. (internal citations and quotations omitted).

Importantly in the case at bar, Bowlson did not request a mistrial. Bowlson's complaint that jurors may have seen him briefly as he was transported to and from the courtroom is not a sufficient basis to justify setting aside his conviction. Although some level of prejudice may be inherent in

jurors viewing a criminal defendant in shackles, here the district court properly instructed the jurors who may have observed the defendant in shackles to disregard what they saw and not to talk about their observations to other jurors. The district court also offered Bowlson other relief, such as excusing those jurors whom Bowlson thought had observed him in shackles, all of which Bowlson rejected. Thus, Bowlson has failed to establish sufficient prejudice to support the reversal of his convictions.

## III. SENTENCING

Finally, Bowlson challenges his sentencing under the federal sentencing guidelines because, he argues, the federal guidelines are unconstitutional. Following the initiation of this appeal, the Supreme Court decided *United States v. Booker*, __ U.S. __, 125 U.S. 738 (2005). Thereafter, in a supplemental letter brief submitted to this court on May 12, 2005, prior to oral argument in this case, the government "determined that it will not oppose a remand for re-sentencing under the Sentencing Reform Act as amended by *Booker*." Thus, we remand this case for re-sentencing in accordance with *United States v. Booker*, 125 U.S. 738 (2005).

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Bowlson's convictions, VACATE his sentence, and REMAND this case to the district court for re-sentencing.