PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-1023 & 10-1373
_____

UNITED STATES OF AMERICA

v.

CURTIS G. WHITEFORD,
                    Appellant at No. 10-1023

MICHAEL B. WHEELER,
                    Appellant at No. 10-1373
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Criminal Nos. 07-cr-00076-001 & 07-cr-00076-003
(Honorable Mary L. Cooper)
_____

Argued January 10, 2012

Before:  SCIRICA, RENDELL and SMITH, *Circuit Judges*.

(Filed: April 13, 2012)

DAVID P. SCHROTH I, ESQUIRE (ARGUED)
795 Parkway Avenue, Suite A-3
Trenton, New Jersey 08618
        Attorney for Appellant, Curtis G. Whiteford

ANNMARIE HARRISON, ESQUIRE (ARGUED)
Henry E. Klingeman, Esquire
Krovatin Klingeman
60 Park Place, Suite 1100
Newark, New Jersey 07102
        Attorneys for Appellant, Michael B. Wheeler

VIJAY SHANKER, ESQUIRE (ARGUED)
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W., Room 1264
Washington, D.C. 20530

John P. Pearson, Esquire
United States Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, N.W., 12th Floor
Washington, D.C. 20530
        Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Curtis Whiteford and Michael Wheeler were officers in the United States Army Reserve who were deployed to Iraq in 2003 to work for the Coalition Provisional Authority. Both defendants were convicted of conspiracy under 18 U.S.C. § 371, for participating in a bid-rigging scheme that involved directing millions of dollars in contracts to companies owned by Philip Bloom, an American businessman. Whiteford and Wheeler raise the following claims on appeal: (1) insufficiency of the evidence to establish each defendant's participation in the conspiracy; (2) failure to grant a new trial in the interests of justice; and (3) erroneous refusal to grant "use immunity" to a co-conspirator. Wheeler also argues his motion to suppress was erroneously denied. In addition, both defendants challenge their sentences. We will affirm.[1]

I.

The Coalition Provisional Authority

The Coalition Provisional Authority ("CPA") was created in May 2003 by the United States, the United Kingdom, and other members of the Coalition Forces to function as a temporary governing body in Iraq. U.S. Secretary of Defense Donald Rumsfeld appointed Ambassador Paul Bremer to serve as Administrator of the

---

[1]We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.

CPA, and shortly after it was established, the U.N. Security Council passed a resolution recognizing the CPA's legitimacy. The U.N.'s resolution called upon the CPA to "promote the welfare of the Iraqi people through the effective administration of the territory . . . ." *See* S.C. Res. 1483, ¶ 4, U.N. Doc. S/RES/1483 (May 22, 2003). For the next fourteen months, the CPA carried out this mandate by administering humanitarian programs and reconstruction projects. To finance its operations, it drew on two sources of funding: U.S. congressional appropriations,[2] and the Development Fund for Iraq ("DFI").[3] On June 28, 2004, the CPA was replaced by the Interim Government of Iraq, a sovereign Iraqi entity.

The CPA's staff, about 3,000 persons, consisted of employees sent by the Governments of Australia, Denmark, Italy, Japan, the United States, the United Kingdom, and other members of the Coalition Forces. For its part, the United

---

[2]In 2003, Congress appropriated $698 million to the CPA. Over the remainder of 2003 and 2004, Congress dedicated another $24.1 billion. Pre-Sentencing Report ("PSR") ¶ 35.

[3]The DFI included $2 billion in Iraqi assets seized by the United States during the first Gulf War, $1 billion from the Oil for Food Program, funding from the World Bank, and contributions from Coalition Forces countries. PSR ¶ 35; *see also United States ex. rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 298-299 (4th Cir. 2009). The CPA was given discretion in spending money from the DFI. *See* S.C. Res. 1483 at ¶13 (noting "that the funds in the Development Fund for Iraq shall be disbursed at the discretion of the [Coalition Provisional] Authority").

States contributed both active-duty service members, including reserves, as well as civilian employees. While assigned to the CPA, members of the U.S. armed forces continued to be bound by the Uniform Code of Military Justice, *see* 10 U.S.C. § 802(a)(1), whose provisions apply "in all places," *id.* § 805. Military officers also continued to be bound by Part 2635 of Title 5 of the Federal Code of Regulations, which sets forth "standards for ethical conduct" for employees of the Executive Branch. 5 C.F.R. § 2635.101(c). Part 2635 extends to persons "on detail" to an international organization, unless they are specifically exempted. *Id.* § 2635.104(c). Given that officers are considered "employees" of the Department of Defense ("DoD"), *id.* § 2635.102(h) ("Employee . . . includes officers but not enlisted members of the uniformed services."), they are bound by Part 2635, and face potential penalties if they deviate from its instructions, *id.* §§ 2635.106(a), 3601.101. As Colonel and Lieutenant Colonel in the U.S. Army Reserve, Whiteford and Wheeler, respectively, were "officers."

The CPA promulgated rules, memoranda, and orders which carried the force of law in Iraq. *See CPA Official Documents*, The Coalition Provisional Authority, http://www.iraqcoalition.org/regulations/ (last visited Feb. 12, 2012). Memorandum Number 4, issued on August 19, 2003, governed contracting procedures. It provided that: "competition is mandatory for all Contracts"; "[r]easonable efforts will be made to obtain competitive offers by publicizing a solicitation"; "[g]rants administered under this Memorandum will not directly or indirectly benefit any

5

Ministry, CPA or Coalition Forces official or employee involved in the contracting or grant-making process"; "[p]ersons involved in the contracting process . . . shall not . . . [u]se public office for private gain"; requirements on a project "may not be split to avoid the application of these rules"; and contracts in excess of $500,000 shall be approved by a special "Award Committee." *See* CPA, *Coalition Provisional Authority Memorandum Number 4: Contract and Grant Procedures Applicable to Vesterd* [sic] *and Seized Iraqi Property and the Development Fund for Iraq*, §§ 6(2), 6(5), 6(6), & 7 (Aug. 19, 2003), *available at* http://www.iraqcoalition.org/regulations.

The Defendants

Curtis Whiteford was a Colonel in the U.S. Army Reserve who lived in Utah. In September 2003, he was deployed to Iraq on active duty. He was assigned to the CPA's headquarters in the South Central Region ("CPA-SC"), located in al-Hillah.[4] Whiteford was appointed Chief of Staff for CPA-SC, which made him the second most senior person in the office after Regional Coordinator Michael Gfoeller. Whiteford's responsibilities included supervising CPA-SC's staff, overseeing CPA-SC's budget of $100

---

[4]The CPA was divided into five regions, each of which was directed by a Regional Coordinator. The South Central region included the cities of Karbala and al-Hillah, and encompassed 50 percent of the land mass and 48 percent of the population of Iraq.

million, managing CPA-SC's reconstruction projects, and serving as a liaison between the CPA and Iraqi nationals.

Michael Wheeler was a Lieutenant Colonel in the U.S. Army Reserve who lived in Wisconsin. In October 2003, he was deployed to Iraq on active duty. He was sent to al-Hillah, to work for the CPA. Wheeler was appointed Deputy Chief of Staff and Deputy Civil Administrator for CPA-SC. This made him responsible for recommending reconstruction projects, facilitating payments from the CPA to contractors, and ensuring that CPA-sponsored projects were completed in a satisfactory manner.

The Conspiracy

Besides Whiteford and Wheeler, there were six other persons either charged with or who pled guilty to participating in the conspiracy to defraud the CPA. These individuals were: (1) Philip Bloom, a U.S. citizen residing in Romania, who owned and managed construction companies throughout the world. One of Bloom's companies, Global Business Group Logistics ("GBG Logistics"), entered into numerous contracts with the CPA and the DoD to carry out construction projects in Iraq. (2) Bruce Hopfengardner, a Lieutenant Colonel in the U.S. Army Reserve, who served in al-Hillah from September 2003 through June 2004. Hopfengardner was an Operations Officer for CPA-SC, reporting to Whiteford. His core duties were to oversee police-related construction projects and to help train the Iraqi police. (3) Robert Stein, a contract employee of the DoD, who served as Comptroller for CPA-SC between November 2003

7

and June 2004, and reported to Whiteford. Stein's position gave him unmonitored access to the CPA's vault. (4) Debra Harrison, a Lieutenant Colonel in the U.S. Army Reserve residing in New Jersey, who was deployed to Iraq from October 2003 to July 2004. Harrison served as a financial specialist and Deputy Comptroller for CPA-SC. In both positions, she fell under Whiteford's chain of command. (5) Seymour Morris, a U.S. citizen residing in Romania, who operated a Cyprus-based financial services business and worked closely with Bloom. (6) William Driver, Harrison's husband.

The conspiracy was hatched in December 2003. While visiting the CPA's headquarters in Baghdad, Philip Bloom met with Stein and Hopfengardner, with whom he was familiar. The three men formed an arrangement: Bloom would pay Stein and Hopfengardner $100,000 up front and $10,000 per month, each, if they would help Bloom secure contracts from CPA-SC. Stein, who was Comptroller of CPA-SC, could withdraw money from the vault at any point. Hopfengardner, who oversaw the office's security projects, could provide Bloom with inside information on bidding to enable Bloom to secure contracts.

Shortly after the Baghdad meeting, several top officials at CPA-SC convened to discuss the police academy construction project. Whiteford, Wheeler, Hopfengardner, and Stein were present, as were others who were not alleged co-conspirators, such as Regional Coordinator Mike Gfoeller. The officials at the CPA-SC meeting collectively decided to break the police academy construction project into pieces,

each under $500,000. This would enable CPA-SC to evade CPA regulations, which mandated that contracts over $500,000 be sent to the Head of Contracting Activity for the CPA, in Baghdad, for review and approval. *See* CPA, *Memorandum Number 4*, § 7, *supra*. Gfoeller supported the idea because he wanted to avoid delays in building the police academy. The co-conspirators had personal motives in supporting the policy change, because it meant Bloom's companies could receive the police academy contracts without interference from the CPA office in Baghdad.

In January 2004, Stein brought Michael Wheeler into the fold. Wheeler's position was key: he was more intimately involved in the details of the contracting process at CPA-SC than Stein or Hopfengardner. Over the next several months, Wheeler helped GBG Logistics secure roughly $5.5 million in contracts. He would develop "scopes of work" that lined up with the firm's capabilities, recommend modifications to their bids to help them win approval, and direct Bloom to disguise the bids so it was not obvious that GBG Logistics was securing so many contracts. In return, Wheeler received airplane tickets, liquor, and other gifts from Bloom. In July, Wheeler helped smuggle money out of Iraq, when he flew to the United States with Debra Harrison on airplane tickets purchased by Bloom. Harrison was carrying $330,000 in stolen CPA funds at the time. She paid Wheeler $1,000 and covered the cost of his hotels and meals on the trip.

Although Whiteford was not at the initial Baghdad meeting between Bloom, Stein and Hopfengardner, he began receiving gifts from Bloom in February 2004. First, he

received an expensive watch and a laptop. Next, he received $10,000 in cash to purchase a business-class airplane ticket home. Although these items were handed to Whiteford by Stein or Hopfengardner, they had been purchased by Bloom. In March, Whiteford and Bloom exchanged emails about starting an airline company in Iraq, and Bloom offered Whiteford the job of president. Whiteford replied that he could not accept the position while on active duty for the U.S. military, but in May, he emailed Bloom information for the proposed airline – such as which airports in Iraq would be controlled by the Iraqi government and which would remain under the control of the Coalition Forces, and how to apply to either authority to provide airline services. He subsequently asked Bloom for help in obtaining a sportscar. In May, Whiteford accepted a business-class airplane ticket home that was purchased by Bloom.

Over the course of the conspiracy, Stein, Hopfengardner, Wheeler, Whiteford, and others helped Bloom obtain $8 million in contracts from CPA-SC. These included contracts for a new Iraqi police academy in al-Hillah, contracts to build a Regional Tribal Democracy Center in al-Hillah, and contracts to construct a library in Karbala. On a regular basis, Stein stole money from CPA-SC's vault and handed it to Bloom, who wire-transferred the funds to foreign bank accounts. Bloom used the stolen CPA funds as well as his own finances to purchase watches, laptops, airplane tickets, and cars for his co-conspirators.

As the bid-rigging and contract-steering to Bloom was underway, Stein, Whiteford, and Hopfengardner discussed

starting a private security company after completing their services with the military. In early 2004, Stein and Hopfengardner ordered a batch of weapons through CPA-SC intending to keep them after the CPA dissolved, for use by their company. Stein arranged for the weapons to be delivered to a military base in Fort Bragg, North Carolina, where Whiteford would pick them up. When the weapons were not ready in time, Harrison and Wheeler agreed to help. After their return to the United States in July 2004, they retrieved the weapons from North Carolina and drove them to Stein's home. Stein permitted Wheeler to keep several pistols, a machine gun, and a silencer.

Arrests and Interviews

In 2006, Stein, Bloom, and Hopfengardner entered into plea agreements with the federal government and agreed to serve as cooperating witnesses. Bloom pled guilty to conspiracy, bribery, and money laundering. He was sentenced to 46 months' imprisonment and ordered to forfeit $3.6 million. Stein pled guilty to conspiracy, bribery, and other charges. He was sentenced to 108 months' imprisonment and ordered to forfeit $3.6 million. Hopfengardner pled guilty to conspiracy and money laundering. He was sentenced to 21 months' imprisonment and ordered to forfeit $144,500.

As the co-conspirators were negotiating these agreements, the federal authorities also began to investigate Wheeler. In July 2005, FBI Agent Courtland Jones called Wheeler by telephone and asked if he had moved weapons from Fort Bragg to Stein's home. Wheeler answered yes. On

the morning of November 30, 2005, Wheeler visited an attorney, and asked what he should do if he were questioned by investigators. His lawyer told him to cooperate with questioning, but to call him if he "got stumped." Later that same day, at 1:00 p.m., a group of federal agents including Agent Jones arrived at Wheeler's home. They came upon Wheeler standing in his driveway. Wheeler asked if the agents were there to talk about Stein. Agent Jones answered yes, "and other things," reminding Wheeler of their phone conversation. Wheeler informed the agents he had spoken with an attorney, who had instructed him to cooperate but to call if he "got stumped." At this point, the agents informed Wheeler he was under arrest, placed him in handcuffs, and directed him to sit in their van. About ten minutes later, the agents removed the handcuffs and gave Wheeler an Advice of Rights form, which he signed. They proceeded to ask him about the weapons from Fort Bragg. Wheeler responded they were in his bedroom closet. At 1:28 p.m., Wheeler signed a form consenting to a search of his residence. The agents searched his home, and recovered many weapons not registered in his name. For about one and a half hours, the agents questioned Wheeler in his kitchen. The interview terminated when Wheeler's daughter came home, and Wheeler was taken to the local sheriff's office. In the car, he requested a phone to call his attorney, and the questioning ceased.

Procedural History

On February 1, 2007, a grand jury returned a 25-count indictment against Whiteford, Wheeler, Harrison, Morris, and

12

Driver. Whiteford and Wheeler were charged with conspiring to commit offenses against the United States (18 U.S.C. § 371); bribery (18 U.S.C. § 201(b)(2)); and eleven counts of honest services wire fraud (18 U.S.C. §§ 1343 & 1346). The indictment set forth the aims of the conspiracy: bribery, wire fraud, interstate transportation of stolen property (18 U.S.C. § 2314), and possession and transportation of unregistered firearms (26 U.S.C. § 5861(d)). Additionally, Wheeler was charged with interstate transportation of stolen property and smuggling bulk cash (31 U.S.C. § 5332).[5]

Before trial, Harrison and Driver were severed from the case and each pled guilty to certain offenses.[6] Also before trial, Wheeler filed a motion to suppress his post-arrest statements and the weapons recovered from his house, which the court denied. On September 8, 2008, Whiteford, Wheeler and Morris went to trial. On November 7, the jury returned its verdict. It found Whiteford guilty of conspiring to commit

---

[5]Harrison was charged with conspiracy, bribery, eleven counts of wire fraud, four counts of transporting stolen property in interstate commerce, four counts of money laundering, and one count of tax fraud. Morris was charged with conspiracy and eleven counts of wire fraud. Driver was charged with four counts of money laundering.

[6]Harrison pled guilty to one count of wire fraud, and Driver to one count of money laundering. At the time of trial, Harrison still awaited her sentence on the wire fraud plea, which turned out to be 30 months' imprisonment followed by two years' supervised release. Driver was sentenced to three years' probation.

13

bribery and interstate transportation of stolen property, and Wheeler guilty of conspiring to commit all four crimes in the indictment. It found Whiteford and Wheeler not guilty of all remaining charges, and Morris not guilty of any charge. Whiteford and Wheeler filed post-judgment motions, which the court denied. The court sentenced Whiteford to 60 months' imprisonment, followed by two years of supervised release, and Wheeler to 42 months' imprisonment, followed by three years of supervised release. It ordered Whiteford to pay $16,200 in restitution, and Wheeler to pay $1,200.

## II.

In their first claim of error, Wheeler and Whiteford contend they should be acquitted because their convictions were supported by insufficient evidence. We review the denial of their post-judgment motions advancing such claims de novo, but in a manner "particularly deferential" to the jury's verdict. *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008). We "view the evidence in the light most favorable to the government and must sustain the jury's verdict if a reasonable jury believing the government's evidence could find guilt beyond a reasonable doubt." *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010) (internal quotation marks and citation omitted). We "examine the totality of the evidence, both direct and circumstantial," and "credit all available inferences in favor of the government." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).

14

A.

The federal conspiracy statute at 18 U.S.C. § 371 provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be [fined or imprisoned]." As is clear from the text, Section 371 has two alternative prongs: an "offenses" prong, which pertains to conspiracies to violate any federal law, civil or criminal, and a "defraud" prong, which pertains to conspiracies to defraud the United States. *United States v. Alston*, 77 F.3d 713, 718 (3d Cir. 1996). The latter may be accomplished by conspiring to cheat the U.S. government of money or property, or to interfere with its operations. *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007).

To prevail in a conspiracy prosecution, the government must prove each of the following elements beyond a reasonable doubt: (1) an agreement between two or more persons to achieve an unlawful goal; (2) the defendant intentionally joined the agreement, with knowledge of its objective; and (3) an overt act taken in furtherance of the conspiracy by a co-conspirator. *United States v. Rigas*, 605 F.3d 194, 206 (3d Cir. 2010) (en banc); *United States v. Gebbie*, 294 F.3d 540, 544 (3d Cir. 2002). The government can prove the existence of the conspiratorial agreement and the knowledge of the defendant with circumstantial evidence alone. *United States v. Tyson*, 653 F.3d 192, 208 (3d Cir. 2011) ("We have [] recognized that the existence of a conspiratorial agreement may be proven by circumstantial

evidence alone."); *United States v. Carr*, 25 F.3d 1194, 1201-03 (3d Cir. 1994) (holding a co-conspirator's knowledge can be proven with circumstantial evidence). Moreover, "[t]he government need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). "Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the government's case." *Id.*

B.

Whiteford and Wheeler concede the evidence was sufficient to show the existence of a conspiratorial agreement to defraud CPA-SC, as well as overt acts taken in furtherance of that conspiracy. Thus, they concede the evidence was sufficient to prove elements 1 (agreement) and 3 (overt acts) of their conspiracy charges. But they claim there was insufficient evidence to prove the second element – their own participation in the conspiracy, undertaken intentionally and with knowledge of its objectives. Whiteford contends there is no proof he knew of the bid-rigging scheme among his subordinates, nor that he intended to further the scheme. Wheeler claims he "knew nothing about the [Baghdad] meeting, the financial arrangements with Bloom, or the agreement to steer contracts to Bloom in return for payment," and urges that the record fails to show otherwise.

Whiteford and Wheeler's insufficiency arguments are unavailing. As to Whiteford, the jury found him guilty of conspiring to commit two offenses: bribery (18 U.S.C. §

16

201(b)(2)), and interstate transportation of stolen property (18 U.S.C.§ 2314). There was sufficient evidence of Whiteford's knowledge and intent as to each. With respect to bribery, Whiteford admitted he was aware that GBG Logistics was winning an "unusual" share of bids from CPA-SC and that Stein was regularly giving Bloom large amounts of cash. The evidence showed he was part of the group that decided to break the police academy contracts into smaller ones (under $500,000), and was in part responsible for the unusual level of access Bloom had to the CPA compound. Meanwhile, there was considerable evidence of Whiteford's personal receipt of benefits. Stein and Hopfengardner testified to witnessing Whiteford accept a $3,500 watch, a laptop, and an expensive business-class airplane ticket to Utah, all of which had been purchased by Bloom. Whiteford accepted these gifts outside of the normal procurement process – he did not fill out any paperwork – and Stein testified he told Whiteford that Bloom had purchased the business-class ticket. The government also presented emails in which Whiteford gave Bloom information about starting an airline in Iraq and asked for help in obtaining a sportscar in return. At the time he made such a request, Whiteford knew Bloom had offered Hopfengardner an expensive car as a gift. Altogether, this evidence was sufficient to permit a jury to find that Whiteford knew of or closed his eyes towards the bribery scheme among CPA-SC officials and Philip Bloom, and that he intended for the scheme to continue so he could reap personal benefits. *See United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006) (holding an individual's participation in a conspiracy may be "demonstrated by showing that a defendant . . . 'deliberately

17

closed his eyes to what otherwise would have been obvious to him'") (citation omitted); *see also United States v. Clay*, 618 F.3d 946, 953 (8th Cir. 2010) ("A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance.") (internal quotation marks and citation omitted).[7]

Whiteford proffers a separate reason why the evidence was insufficient to show his participation in a conspiracy to commit bribery: during the time in question, he was not a "public official" performing "official acts." This argument lacks merit. The bribery statute underlying Whiteford's conspiracy conviction makes it a crime for a "a public official . . . [to] seek[], receive[], accept[], or agree[] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). The term "public official" is defined as any "officer or employee . . . acting for or on behalf of the United States . . . in any official function, under or by authority of any such

_____

[7]For further support of the notion that willful blindness can satisfy the knowledge requirement, see Third Circuit Model Criminal Jury Instructions § 5.06 ("When . . . knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may prove that (name) knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that (name) deliberately closed (his) (her) eyes to what otherwise would have been obvious to (him) (her). No one can avoid responsibility for a crime by deliberately ignoring what is obvious.").

department[.]" *Id.* § 201(a)(1). The term "official act" means "any decision or action . . . in such official's official capacity, or in such official's place of trust or profit." *Id.* § 201(a)(3). Whiteford and Wheeler were "employees" of the federal government when they were deployed to Iraq. 5 C.F.R. § 2635.102(h) (providing that officers in the uniformed services are employees of the DoD). Their acts assisting Bloom were taken in their "place of trust" at CPA-SC. Accordingly, Whiteford and Wheeler were "public officials" in the performance of "official acts" during the time in question, and 18 U.S.C. § 201(b)(2) applied to their conduct. *See Dixson v. United Sates*, 465 U.S. 482, 496 (1984) (holding the federal bribery statute is "'applicable to all persons performing activities for or on behalf of the United States,' whatever the form of delegation of authority") (citation omitted); *United States v. Kidd*, 734 F.2d 409, 411-12 (9th Cir. 1984) (holding an Army private was a "public official" under 18 U.S.C. § 201(b)(2)).

There was also sufficient evidence of Whiteford's knowledge and intent as to the transportation of stolen property objective. Stein testified to giving Whiteford $10,000 from the CPA vault in February 2004, after Whiteford approached Stein and asked him for assistance in going on leave. Stein explained it was "obvious" the money came from the vault – there were no ATM machines in al-Hillah, and Stein had handed Whiteford a "banded packet" of cash, which was how funds in the vault were packaged. Although CPA rules forbade using vault funds for personal travel expenditures, Whiteford took the $10,000 and purchased a business-class ticket home. He also transported

$3,500 in "left over" money into the United States and tried to give it to his wife – who refused to accept it, because she thought it was stolen. From this evidence, the jury could have concluded Whiteford knew the money was stolen, and intended to transport stolen property in interstate commerce.

As to Wheeler, the evidence was also sufficient to support his conviction for conspiracy under 18 U.S.C. § 371. The jury found Wheeler guilty of conspiring to commit bribery, wire fraud, interstate transportation of stolen property, and unlawful possession of firearms. There was ample evidence of Wheeler's knowledge and intent as to each. With respect to bribery, the government presented emails and witness testimony demonstrating that Wheeler regularly provided Bloom with inside information about bids, coached him in modifying his proposals so they better fit the CPA's specifications, and told him to submit bids under different company names so that he could win more contracts. In return, Bloom provided Wheeler airplane tickets, weapons, and liquor. With respect to honest services wire fraud, the government presented records of numerous wire transfers made by Bloom in which he moved stolen-CPA funds into foreign bank accounts. Bloom then used the funds to pay kick-backs to his co-conspirators. Because Wheeler was a member of the bribery conspiracy and was intimately involved in the contracting process at CPA-SC, it was reasonable for the jury to find that Wheeler knew of the wire transfers. With respect to interstate transportation of stolen property, the government presented records showing that Wheeler flew to the United States with Debra Harrison in July 2004, on airplane tickets purchased by Bloom. As noted,

Harrison was transporting $330,00 in stolen CPA funds on this flight, and in email to Stein, she told him she had given Wheeler $1,000 and paid for his rooms and meals. Finally, as to the possession of unregistered firearms, a federal agent testified for the government that two pistols, a rifle, a machine gun, and a silencer were seized from Wheeler's home, and none were registered to him under the National Firearms and Registry Record. Accordingly, this evidence provided the jury sufficient grounds to find Wheeler guilty of conspiring to achieve all four charged objectives.

C.

Whiteford and Wheeler contest the sufficiency of the evidence in yet another manner: they argue the evidence was insufficient because the government failed to prove the CPA is part of the U.S. government. In making this claim, the defendants assert that any conviction under 18 U.S.C. § 371 requires that the United States be the intended target of the conspiratorial scheme. Because the government failed to show the CPA was a U.S. entity, the defendants claim, the evidence was insufficient to support their convictions.

This argument lacks merit. As explained *supra*, Section 371 of Title 18 has both an "offenses" prong and a "defraud" prong. Only the latter requires that the conspirators intend to harm the federal government. *Compare United States v. Feola*, 420 U.S. 671 (1975) (holding, in an "offenses" prosecution under § 371, it was not necessary to prove the defendant knew the intended victim was a federal officer), *with McKee*, 506 F.3d at 238 (3d Cir. 2007) (holding,

in a "defraud" prosecution under § 371, there was sufficient proof of defendants' "advocacy of non-tax-payment [to the federal government] as well as overt acts and omissions . . . to effectuate those goals"), *and United States v. Rankin*, 870 F.2d 109, 113-14 (3d Cir. 1989) (holding, in a "defraud" prosecution under § 371, the indictment pled sufficient facts to allege defendants intended "to defraud the United States by impairing the lawful function of the United States District Court"). Meanwhile, the indictment, jury instructions, and verdict sheets all make clear that Whiteford and Wheeler were charged with, tried for, and convicted of, violating the "offenses" prong of § 371. Even the underlying crimes which Whiteford and Wheeler were found guilty of conspiring to achieve – bribery, interstate transportation of stolen property, wire fraud, and unlawful possession of weapons – do not require the United States to be the intended target of the criminal activity.[8]   Accordingly, the status of the CPA as a U.S. entity has no bearing on the sufficiency of the evidence.

---

[8]*See* 18 U.S.C. 201(b)(2)(A) (making it unlawful for "a public official" to "receive[], accept[], or agree[] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act"); 18 U.S.C. § 2314 (making it unlawful to transport "any goods . . . securities or money, of the value of $5,000 or more, knowing the same to have been stolen");  18 U.S.C. § 1343 ("Whoever, having devised . . . any scheme or artifice to defraud . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . shall be [punished]."); 26 U.S.C. § 5861(d) ("It shall be unlawful for any person . . . to receive

22

III.

In the alternative, Whiteford and Wheeler request new trials "in the interest of justice" under Fed. R. Crim. Proc. 33(b) for two reasons. First, they claim a private attorney for Philip Bloom was "coaching" him from the courtroom while he testified, thereby tainting the jury's verdict. Because the fact of Bloom's coaching was confirmed only after the trial concluded, the defendants argue, it qualifies as "newly discovered evidence" and warrants a new trial.[9] Second,

_____

or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.").

[9]In the middle of Bloom's cross-examination by Morris's counsel, Whiteford's attorney requested a sidebar. He informed the District Judge that based on his observations and those of Whiteford's wife, he believed a lawyer for Bloom had been making gestures to him from the courtroom as he testified. The District Judge instructed a deputy to watch the person indicated, and the deputy "observed nothing." No curative instruction was given, and none of Bloom's testimony was stricken. It turned out the "private attorney" Whiteford's counsel referred to was an associate who had joined the law firm representing Bloom two weeks earlier. The associate had not yet passed the bar nor worked on the case, and was sent to court solely to watch. After the jury rendered its verdict, the District Judge met with each juror to thank them for their service. During one such meeting, one juror suggested to the District Judge that he or she had seen a person making gestures to Bloom while he testified. The court informed the parties.

23

Whiteford and Wheeler contend a new trial is necessary because the court did not charge the jury as to the identities of the co-conspirators. We review the court's denial of Whiteford and Wheeler's post-judgment motions, in which they advanced these claims, for abuse of discretion. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).[10]

The District Court did not err in declining to grant Whiteford and Wheeler new trials "in the interest of justice." As to the alleged "coaching" of Bloom by a lawyer who turned out to be an associate from the firm representing Bloom, such a fact, assuming it qualifies as "newly discovered evidence," would only warrant a new trial if it was "of such nature, as that . . . [it] would probably produce an acquittal." *United States v. Quiles*, 618 F.3d 383, 388-89 (3d Cir. 2010) (citation omitted). "[N]ewly discovered evidence that is *merely* impeaching is unlikely to reveal that there has been a miscarriage of justice. There must be something more . . . suggest[ing] directly that the defendant was convicted wrongly." *Id.* at 392. Whiteford and Wheeler fail to meet this standard; that is, they fail to demonstrate how the fact of Bloom's "coaching" would "probably produce an acquittal" were it presented to a jury. The court found "not a scrap of information to the effect that Mr. Bloom falsified his testimony on the basis of whatever this young attorney was

---

[10]Note, however, that only Wheeler included the jury instructions issue in his post-judgment motion requesting a new trial. Thus, the analysis of the jury instructions as to Whiteford is for plain error. *United States v. Bey*, 736 F.2d 891, 895 (3d Cir. 1984).

allegedly signaling to him." Accordingly, the discovery of Bloom's "coaching" does not warrant a new trial. *See Duke v. United States*, 255 F.2d 721, 728 (9th Cir. 1958) ("We entirely disapprove of the practice of any witness in a criminal case, especially a government witness, receiving secret advice from anyone while he is on the stand. It is a destructive precedent. But, in the present case, it obviously did not harm [the defendant] . . . . The error was not prejudicial.").[11]

Defendants also seek a new trial because the court did not include the names of the co-conspirators in the jury instructions.[12] We disagree. In the indictment, the government alleged that Whiteford and Wheeler "did knowingly conspire . . . with Bloom, Hopfengardner, Stein and other persons known and unknown to the Grand Jury" to commit the conspiratorial schemes listed. When indictments are written in such a manner, so as to include more than one named co-conspirator, the identity of the additional co-conspirator(s) is

---

[11]Additionally, for "newly discovered evidence" to warrant a new trial under Rule 33, there must be "diligence on the part of the movant" to discover the evidence and bring it to the attention of the court. *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). Arguably, Whiteford and Wheeler fell short of the "diligence" requirement in failing to request additional cross-examination of Bloom, after suspecting that he was being coached.

[12]In discussing the conspiracy charge, the jury instructions mentioned only the names of the three defendants – Whiteford, Wheeler, and Morris.

not treated as an element of the offense. *United States v. De Cavalcante*, 440 F.2d 1264, 1272 (3d Cir. 1971) ("The existence of an agreement, rather than the identity of those who agree, is the essential element to prove the crime of conspiracy."). The court's jury instructions for the conspiracy charge conformed to the law as well as to the model instructions of this Circuit. *Compare* Whiteford App. 2202-12 (jury instructions for the conspiracy charge), *with* Third Circuit Model Criminal Jury Instructions § 6.18.371A (model jury instructions for conspiracy under 18 U.S.C. § 371 in an "offenses" prosecution). Whiteford and Wheeler cite no authority supporting their proposition that the jury should have been instructed on the names of their co-conspirators. *See United States v. Hopper*, 384 F.3d 252, 257-58 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1136 (2005) (upholding the court's jury instructions despite the defendant's claim that they caused him prejudicial error in failing to specify the identity of his co-conspirators); *United States v. Leahy*, 82 F.3d 624, 631-32 (5th Cir. 1996) (upholding the court's jury instructions in a conspiracy case where they referred to "two or more persons" but not any named individuals).

IV.

Wheeler contends the court erred in declining to grant his motion to suppress statements he made to the police after his arrest, and the weapons recovered from his house. He argues the statements should be suppressed because his *Miranda* waiver had been deficient and his "testimony" to the police involuntary, and the weapons seized were fruit of the

26

poisonous tree. We review the denial of Wheeler's motion "for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

The court properly denied Wheeler's motion. Beginning with Wheeler's *Miranda* waiver, there is nothing to suggest it was deficient. The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010). A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Wheeler's signing of the "Advice of Rights" form satisfies this standard. He was not intimidated nor coerced, and his level of education would have enabled him to read the form and comprehend its meaning. *Berghuis*, 120 S. Ct. at 2262 (holding a *Miranda* waiver was valid when the defendant "received a written copy of the *Miranda* warnings . . . could read and understand English . . . [and] was given time to read the warnings"). Although Wheeler argues the agents' failure to inform him of the specific charges against him subjected him to "psychological pressure," he points to nothing that might show his "will was overcome or [his] capacity for self-control vitiated." *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989). He also cites no authority, and we are

aware of none, holding that a defendant must know of the charges against him to validate a *Miranda* waiver.

Wheeler's reference to his attorney – which he made before signing the Advice of Rights form – does not change the analysis. When the agents arrived, Wheeler informed them he had consulted an attorney and that the attorney directed him to cooperate unless he "got stumped." These remarks were not an objectively identifiable request for counsel, and they did not amount to an invocation of Wheeler's Fifth Amendment rights. *See Davis v. United States*, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."). Accordingly, Wheeler's remark about his attorney did not make his subsequent *Miranda* waiver invalid.

Furthermore, there is no evidence demonstrating that after Wheeler signed the *Miranda* waiver form, his statements to the police and his consent to the search of his house were involuntary. While in his driveway, Wheeler informed the officers the weapons from Fort Bragg were in his bedroom, and he offered to lead them to the spot. He then signed a consent form authorizing a search of his house, and helped the officers gain entry. Wheeler participated in a one and a half hour discussion in his kitchen, during which he answered questions and retrieved documents the agents requested. Throughout, there were no threats, nor raised voices, nor did

28

Wheeler indicate he wished to stop answering questions. There was no indication his will was overborne.

Accordingly, the court did not err in finding Wheeler's statements and the physical items retrieved from his house admissible.

V.

Whiteford and Wheeler contend the court erred in refusing to grant use immunity to co-conspirator Debra Harrison. Wheeler requested immunity for Harrison in a pre-trial motion, which the court denied, and Whiteford raises the immunity issue for the first time on appeal. We review for abuse of discretion with respect to Wheeler's claim, *Perez*, 280 F.3d at 348, and for plain error with respect to Whiteford's, *United States v. Olano*, 507 U.S. 725, 731-32 (1993).

Use immunity may be conferred by a judge when a witness refuses to testify. It prohibits the government from using the witness's compelled testimony in a subsequent criminal prosecution against him, except in select cases. 18 U.S.C. § 6002. Wheeler requested use immunity for Harrison so she could testify as a defense witness and be precluded from invoking her Fifth Amendment right against self-incrimination. The government opposed this request, because it had an interest in continuing to prosecute Harrison on the charges to which she had not pled guilty and because her

sentencing hearing was scheduled for after the trial.[13] A magistrate judge recommended that Wheeler's motion be denied, and the court adopted this recommendation.

There are two instances in which a defense witness may be granted use immunity in the interests of due process: first, where the prosecution has shown a "deliberate intent to disrupt the factfinding process"; second, where the testimony is "essential to the defense case and when the government has no strong interest in withholding use immunity." *Government of V.I. v. Smith*, 615 F.2d 964, 975 (3d Cir. 1980). Only the second category is relevant here, because neither Whiteford nor Wheeler have alleged the government intended to disrupt the factfinding process. Instead, Wheeler claimed in his pre-trial motion that Harrison's testimony was "essential to his defense" because she would state that he did not know she was transporting stolen funds when they traveled together, and that he acted innocently when he took possession of the weapons in North Carolina. On appeal, Whiteford alleges Harrison's testimony would also have been "essential exculpatory evidence," because she would have "corroborated Whiteford's claim that he did not know [the co-conspirators] were stealing."

---

[13]The government wanted to avoid having to face a *Kastigar* hearing down the road, at which it would have to prove that immunized testimony was not being used against Harrison in her prosecution. *See Kastigar v. United States*, 406 U.S. 441, 462 (1972).

The court's refusal to grant use immunity to Harrison was not in error. To be essential to one's defense, testimony must be "clearly exculpatory." *United States v. Cohen*, 171 F.3d 796, 802 (3d Cir. 1999); *Smith*, 615 F.2d at 974. Testimony that is "ambiguous . . . cumulative, or . . . found to relate only to the credibility of the government's witnesses" will not meet this bar. *United States v. Lowell*, 649 F.2d 950, 964 (3d Cir. 1981). The court's determination that Harrison's testimony would not be "clearly exculpatory" for Wheeler was not an abuse of discretion, because in multiple portions of Harrison's statements to the police, she inculpated Wheeler. *See Perez*, 280 F.3d at 350 (holding a witness's anticipated testimony was not "clearly exculpatory" when it was going to be undercut by a prior inconsistent statement implicating the defendant). The denial was not plain error as to Whiteford, because there is no indication Harrison would have provided "clearly exculpatory" testimony essential to his defense.

## VI.

Whiteford and Wheeler raise several challenges to their sentences. We review a district court's sentence in a two-staged inquiry. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). First, we ask whether the court committed any "significant procedural error" when imposing the sentence – such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, [or] failing to consider the §3553(a) factors." *Id.* Next, we review the "substantive reasonableness" of the sentence, focusing on the totality of circumstances. *Id.* "The

abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 46 (2007)).

Whiteford challenges his sentence on two grounds: first, he contends the court erred in its "loss calculation," which it used to derive the guidelines range for his conspiracy conviction; second, he contends the court gave inadequate consideration to the sentencing factors under 18 U.S.C. § 3553(a). Both claims lack merit. With respect to the loss calculation, the court held the losses attributable to Whiteford's bribery objective should be equal to the value of the "reasonably foreseen" bribes of Whiteford and his co-conspirators. These bribes included automobiles, laptops, watches, and airplane tickets purchased by Bloom for Whiteford, Hopfengardner, and Stein, and they totaled $159,891. The court's calculations were proper. According to U.S.S.G. § 2B1.1(b), a court may include the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" when determining the "losses" caused by a defendant. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Robinson*, 603 F.3d 230, 233-34 (3d Cir. 2010). There was ample evidence at trial that Whiteford knew of – or could reasonably have foreseen – each bribe in the loss calculation. Thus, the $159,891 estimation was factually and legally sound.[14]

---

[14]It is also worth noting that the court's loss calculation was considerably more conservative than that in the PSR. The court calculated the losses to be $159,891, which triggered a

32

Whiteford also contends the court failed to adequately consider the sentencing factors under 18 U.S.C. § 3553(a). He alleges it overlooked "the need to avoid unwarranted sentence disparities among defendants," *see* 18 U.S.C. § 3553(a)(6), because it sentenced him to 60 months while his co-conspirators received lower terms. But the court considered each § 3553(a) factor and specifically mentioned the need to avoid "unwarranted disparities." It concluded 60 months was proper for Whiteford, given "the gravity of someone who was in [his] position" participating in the conspiracy. This determination was substantively reasonable. *See Quiles*, 618 F.3d at 397 ("[A] defendant does not have a right to be sentenced equally with his co-defendants.").

Wheeler brings three challenges to his sentence, all of which we reject. First, he contends the court erred in imposing a four-level enhancement under U.S.S.G. § 2C1.1(b)(3), when it calculated the offense level for the bribery objective of his conspiracy conviction. A four-level increase is applied when a theft or fraud offense "involve[s] an elected public official or any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3). The court held § 2C1.1(b)(3) should apply to Wheeler because as a project officer at CPA-SC, he was an "integral participant in the bidding, and contracting, and payment process." Wheeler's "signatures had to be on recommendations for projects before they went to the contract

---

level enhancement of 10 for the bribery objective. The PSR calculated the losses to be over $ 1 million, triggering a level enhancement of 16. *See* PSR ¶¶ 186, 189.

officers for review" and he was privy to confidential information about the CPA's scopes of work and bid specifications. The court's conclusion was reasonable. *See* U.S.S.G. § 2C1.1 cmt. 4(A) (defining a "[h]igh-level decision-making or sensitive position" as one "characterized by . . . a substantial influence over the decision-making process").

Second, Wheeler argues the court erred in imposing a six-level enhancement under U.S.S.G. § 2K2.1(b)(1)(C) when it calculated the offense level for the firearms objective of his conspiracy conviction. Wheeler's claim lacks merit. To count the firearms involved, the court tallied "all of the unregistered firearms that were possessed by Stein, Wheeler, and Harrison as of the day that they're all standing at Stein's house divvying up those weapons." It found "40 or so" weapons "were encompassed within that entire transaction." This calculation was proper. Section 2K2.1(b) provides that all firearms "involved" in an "offense" are to be included in the firearms count for the level enhancement. *See* U.S.S.G. § 2K2.1(b)(1). Wheeler's "offense" was conspiring to possess and transport unregistered firearms, and including all "unregistered firearms" in the possession of Stein, Wheeler and Harrison on the day they divided up the weapons was reasonable. The attachment of the six-level enhancement was proper. U.S.S.G. § 2K2.1(b)(1)(C) (providing a six-level enhancement for a firearms count of 25-99).

Finally, Wheeler contends the court failed to adequately consider the sentencing factors under § 3553(a) because it overlooked the need to avoid unwarranted

disparities when determining his sentence. Wheeler is incorrect. The court discussed each § 3553(a) factor when it set his sentence, again mentioning the disparity factor. It explained why 42 months' imprisonment was a fair term for Wheeler as compared to the sentences for his co-conspirators, given his high position of authority in Iraq. The court's procedures were proper and its sentence was substantively reasonable.

## VII.

For the foregoing reasons, we will affirm the judgments of conviction and sentences.